FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2016 JUL -6  PM 3: 12

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

UNITED STATES OF AMERICA

v.

CORRINE BROWN
ELIAS SIMMONS

Case No.    3:16-cr- 93 - J - 39 32 JRK

Ct. 1:          18 U.S.C. § 1349
Cts. 2 – 8:    18 U.S.C. §§ 1341 & 2
Cts. 9 – 17:  18 U.S.C. §§ 1343 & 2
Ct. 18:        18 U.S.C. §§ 641 & 2
Cts. 19 – 20: 18 U.S.C. § 1001(a)(1)
Ct. 21:        26 U.S.C. § 7212(a)
Cts. 22 – 24: 26 U.S.C. § 7206(1)
Forfeiture:   18 U.S.C. § 981(a)(1)(C) &
               28 U.S.C. § 2461(c)

## INDICTMENT

The Grand Jury charges:

## COUNT ONE
### (CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD)

At all times material,

## GENERAL ALLEGATIONS

1.      The defendant CORRINE BROWN (BROWN) was a United States

Congresswoman.   From in or about 1993 through in or about 2012, BROWN

represented the 3rd congressional district of Florida.   From in or about 2013 to the

present, BROWN represented the 5th congressional district of Florida.   BROWN

was affiliated with an official campaign committee, Friends of Corrine Brown, as

well as a Political Action Committee (PAC), Florida Delivers Leadership PAC.

BROWN maintained residences in the Middle District of Florida and the Commonwealth of Virginia.

2.      From in or about 1993 to in or about 2016, the defendant ELIAS R. "Ronnie" SIMMONS (SIMMONS) was employed as BROWN's Chief of Staff and was the most senior employee in BROWN's congressional office.   SIMMONS resided in Laurel, Maryland.   SIMMONS exercised control over the finances of Friends of Corrine Brown and Florida Delivers Leadership PAC.

3.      Co-conspirator Carla Wiley (Wiley) was a resident of the Commonwealth of Virginia.

4.      Person A was a part-time employee in BROWN's congressional office, who operated an independent consulting business, Entity A, which engaged in various paid consulting and public relations activities on behalf of Friends of Corrine Brown, among other clients.

5.      Person B was a close relative of BROWN, and a lobbyist in the Washington, D.C. area.

6.      Entity B was a non-profit based in Jacksonville, Florida that offers mental health and substance abuse treatment to residents in the Jacksonville, Florida area.

**One Door For Education**

7.      On or about April 7, 2011, Wiley submitted Articles of Incorporation (AOI) for a Nonstock Corporation named "One Door For Education – Amy Anderson Scholarship Fund" (One Door For Education) to the State Corporation

2

Commission (SCC) for the Commonwealth of Virginia.   The AOI specified that One Door For Education was "organized exclusively for charitable, educational, and scientific purposes under section 501(c)3 [sic] of the Internal Revenue code, or corresponding section of any future tax codes."   The AOI listed Wiley as the President of One Door For Education.   On or about May 16, 2011, One Door For Education received a Tax Identification Number from the Internal Revenue Service (IRS).

8.      On or about September 30, 2012, the SCC automatically terminated One Door For Education's corporate status with the Commonwealth of Virginia for failure to pay annual registration fees.

9.      On or about June 5, 2014, Wiley, at SIMMONS's direction, applied for and obtained reinstatement of One Door For Education's corporate status with the Commonwealth of Virginia.

10.     One Door For Education was not registered in the Commonwealth of Virginia or the State of Florida to solicit or receive charitable contributions.

11.     One Door For Education was not a section 501(c)(3) charitable organization properly registered with the IRS.   As such, contributions to One Door For Education were not tax deductible.

12.     In or about May 2011, Wiley opened a checking account in the name of One Door For Education at Capital One bank.   The initial account was closed in or about May 2012, and Wiley established a new Capital One checking account in the name of One Door For Education in or about August 2012.

3

13.     In or about 2012, after opening the second One Door For Education bank account, Wiley gave the check book and debit card for the checking account to SIMMONS.   Wiley subsequently gave SIMMONS new debit cards and checks for the One Door For Education account.

14.     Numerous checks from donors located in the Middle District of Florida were negotiated and deposited at Capital One locations in Maryland and Virginia, and many of the donations were transmitted to SIMMONS and Wiley via the United States Postal Service or commercial interstate carrier.

### THE CONSPIRACY

15.     Between in or about late 2012 and in or about early 2016, in the Middle District of Florida, Virginia, Maryland, Washington, D.C., and elsewhere,

CORRINE BROWN and
ELIAS SIMMONS,

the defendants herein, did knowingly and willfully combine, conspire, confederate and agree with each other, and others known and unknown to the grand jury, to devise and intend to devise a scheme and artifice to defraud, and for obtaining money by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, to deposit or cause to be deposited any matter or thing whatever to be sent or delivered by the United States Postal Service or any private or commercial interstate carrier, and to transmit and cause to be transmitted by means of wire, in interstate and foreign commerce, certain writings,

4

signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1341 and 1343.

## PURPOSE OF THE CONSPIRACY

16.     The purpose of the conspiracy was for BROWN, SIMMONS, and others known and unknown to the grand jury unlawfully to enrich themselves by fraudulently soliciting and receiving hundreds of thousands of dollars in contributions, donations, and payments to One Door For Education and Entity A based on the false pretense that the funds would be used for charitable and other purposes, and instead using the funds for their own personal and professional benefit.

## MANNER AND MEANS

17.     It was part of the conspiracy that BROWN, SIMMONS, and Wiley used BROWN's official position as a Member of Congress to solicit contributions to One Door For Education and to induce individuals and entities to make donations to One Door For Education based on false and fraudulent representations that the funds would be used for charitable purposes, including, among other things, scholarship assistance for disadvantaged students and the purchase of computers to be donated to local schools in the Middle District of Florida and elsewhere.   As a result of BROWN's, SIMMONS's, and Wiley's fraudulent solicitations, One Door For Education took in over $800,000 in donations.

18.     It was further part of the conspiracy that, in order to raise money for One Door For Education, BROWN, SIMMONS, Wiley, and others planned and

held a series of social and political events that were sponsored by One Door For Education and hosted by BROWN or held in BROWN's honor.   In connection with the events, BROWN, SIMMONS, Wiley, and others falsely led donors to believe that money raised in connection with these social events would be used to support the charitable mission of One Door For Education and other charities.

19.   It was further part of the conspiracy that, as a means to induce individuals and entities to make donations, promotional material for One Door For Education, including the entity's website, event invitations, donation requests, and fliers often included photographs of BROWN and references to BROWN's position as a Member of Congress.

20.   It was further part of the conspiracy that BROWN personally solicited donations to One Door For Education during in-person meetings and telephone conversations with potential donors, including individuals and entities that she knew by virtue of her position as a Member of Congress.   BROWN's in-person solicitations of potential One Door For Education donors often occurred during lunches and dinners, among other social gatherings.

21.   It was further part of the conspiracy that, after BROWN personally solicited donations to One Door For Education during in-person meetings and telephone conversations with potential donors, SIMMONS oftentimes communicated via email with the potential donors to memorialize and finalize their agreements to donate to One Door For Education.

6

22.    It was further part of the conspiracy that, for the purpose of inducing potential donors to make donations, BROWN, SIMMONS, and Wiley promoted One Door For Education as being properly registered as a section 501(c)(3) tax-exempt charitable organization, when, in fact, it was never registered as a tax-exempt organization and was not entitled to receive tax deductible donations.

23.    It was further part of the conspiracy that SIMMONS and Wiley provided to donors "gift receipts" falsely representing that One Door For Education was a properly registered section 501(c)(3) tax-exempt charitable organization, when, in fact, at no time was One Door For Education properly registered as such.

24.    It was further part of the conspiracy that BROWN would make false representations to One Door For Education donors in order to fraudulently obtain payments for what BROWN promoted as other legitimate purposes, when, in fact, and unknown to the donors, the purpose of BROWN's solicitations was to misappropriate such payments for BROWN's and, at times, Person B's personal financial benefit.

25.    It was further part of the conspiracy that BROWN and SIMMONS diverted and caused to be diverted funds from BROWN's campaign, Friends of Corrine Brown, and her Member-affiliated PAC, Florida Delivers Leadership PAC, to One Door For Education, and, at times, directly to BROWN's personal bank account.

26.    It was further part of the conspiracy that BROWN, SIMMONS, and Wiley used the vast majority of funds donated to One Door For Education for their

own personal and professional benefit, distributing only two scholarships to students for expenses associated with attending a college or university—a $1,000 payment in or about February 2013, drawn from Wiley's personal funds, to an individual residing in Virginia, and a $200 payment in or about June 2015 to an individual residing in Florida.

27.    It was further part of the conspiracy that, in order to conceal the misuse of One Door For Education funds, on more than two dozen occasions spanning more than three years, BROWN caused SIMMONS to withdraw cash totaling tens of thousands of dollars from the One Door For Education bank account at ATMs near SIMMONS's residence and deposit cash directly into BROWN's personal bank accounts for her personal use.

28.    It was further part of the conspiracy that, in order to conceal the misuse of One Door For Education funds, BROWN and SIMMONS caused thousands of dollars in checks from One Door For Education to be deposited into Entity A's bank account, which funds were subsequently used to obtain cash that Person A deposited into one of BROWN's personal bank accounts and, at times, Person B's personal bank account.

29.    It was further part of the conspiracy that BROWN, SIMMONS, and Wiley used One Door For Education funds for a variety of personal expenses, including, among other things, costs associated with plane tickets, repairs to personal vehicles, and luxury vacations in the Bahamas, Los Angeles, California, and Miami Beach, Florida.

8

30. It was further part of the conspiracy that tens of thousands of dollars in checks from One Door For Education were made payable to SIMMONS.

31. It was further part of the conspiracy that Wiley transferred tens of thousands of dollars from the One Door For Education bank account to her personal bank accounts.

32. It was further part of the conspiracy that BROWN, SIMMONS, and Wiley used more than $200,000 in One Door For Education funds to pay for events hosted by BROWN or held in BROWN's honor, including a golf tournament in Ponte Vedra Beach, Florida; lavish receptions during an annual conference in Washington, D.C.; the use of a luxury box during a Beyoncé concert in Washington, D.C.; and the use of a luxury box during an NFL game between the Washington Redskins and the Jacksonville Jaguars in the Washington, D.C. area.

33. It was further part of the conspiracy that BROWN, SIMMONS, Wiley, and others performed acts and made statements to hide and conceal and cause to be hidden and concealed the purpose of the conspiracy and the acts committed in furtherance thereof.

## OVERT ACTS

34. In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Middle District of Florida and elsewhere:

9

**Misrepresentations Regarding One Door For Education**

35.     On or about August 22, 2012, BROWN and SIMMONS caused to be transmitted to a potential donor a letter soliciting a donation to One Door For Education in support of a reception honoring BROWN for her "efforts in the arena of protecting and promoting the advancement, health and wellbeing of minority youth."   The letter, which was drafted on Friends of Corrine Brown campaign letterhead and bore BROWN's electronic signature, directed that checks be made payable to One Door For Education and indicated that the organization was a "501c3."

36.     On or about August 31, 2012, BROWN and SIMMONS, based on their fraudulent representations and omissions concerning One Door For Education, caused a PAC affiliated with the transportation industry to make the first significant donation to One Door For Education, in the amount of $25,000.

37.     In or about late 2012 or early January 2013, BROWN caused to be transmitted to potential donors in the Middle District of Florida a letter soliciting contributions to One Door For Education in connection with an effort to send senior citizens from Florida to Washington, D.C. for the Presidential Inauguration.   The letter, which bore a One Door For Education logo and BROWN's electronic signature, described sponsorship levels of up to $20,000 and contained the following representation, among others: "Remember that your contributions go toward the cultivation and maintenance of . . . youth mentoring, scholarships and programming."

38.     Between in or about May and July 2013, BROWN, SIMMONS, and Wiley caused to be distributed a flier for a golf tournament held on or about July 13, 2013, at TPC Sawgrass in Ponte Vedra Beach, Florida, which contained BROWN's picture and the official seal of the United States House of Representatives, and stated that One Door For Education was sponsoring the tournament "[t]o benefit [a national trade group's] Jacksonville Chapter Scholarship Fund and Other Community Non-Profits."

39.     Between in or about May and July 2013, and in connection with the golf tournament, BROWN, SIMMONS, and Wiley caused to be transmitted to potential donors letters bearing a One Door For Education logo and BROWN's signature.   In addition to describing the golf event, the letter represented: "One Door For Education Foundation, Inc. is a non-profit organization that will use this golf outing to raise funds for [the trade group's] Jacksonville Chapter scholarship fund and other community non-profits."   The letter continued:   "I [BROWN] am asking you to become a sponsor."   An attached sponsorship form described sponsorship levels ranging from $125 to as high as $20,000, at which level a "sponsor" was eligible to play in a foursome with a public official.   The letter further solicited donors to write checks to One Door For Education.

40.     On or about June 3, 2013, based on fraudulent misrepresentations and omissions by BROWN and SIMMONS concerning One Door For Education, donor P.D.C., a development company, transmitted via Federal Express (tracking number 7999 0946 9798) a $5,000 check written to One Door For Education

11

(check number 17086), from the Middle District of Florida to SIMMONS's home address in Laurel, Maryland.

41.      Between on or about June 6 and 25, 2013, SIMMONS engaged in email communication with J.L.W., an individual acting on behalf of a charitable foundation in the Middle District of Florida, concerning a potential $5,000 donation to One Door For Education in support of a purported computer drive for students. On or about June 18, 2013, after J.L.W. declined to make the requested donation because One Door For Education was not properly registered with the IRS as a tax exempt organization, SIMMONS emailed J.L.W. and asked whether J.L.W. would instead issue a $5,000 check to Entity B for the same purported computer drive. J.L.W. declined to issue a check to Entity B.

42.      On or about July 2, 2013, based on fraudulent misrepresentations and omissions by BROWN and SIMMONS concerning One Door For Education, donor P.D.C. transmitted via Federal Express (tracking number 7961 4371 4338) a $5,000 check written to One Door For Education (check number 17130), from the Middle District of Florida to SIMMONS's home address in Laurel, Maryland.

43.      On or about August 5, 2013, based on fraudulent misrepresentations and omissions by BROWN and SIMMONS concerning One Door For Education, donor B.H., a communications company, issued a $20,000 check written to One Door For Education (check number 264353), which was subsequently deposited into the One Door For Education Capital One bank account in Laurel, Maryland, on or about August 9, 2013.

12

44.     In or about August and September 2013, BROWN, SIMMONS, and

Wiley transmitted and caused to be transmitted an invitation for a reception

honoring BROWN in Washington, D.C.   The invitation contained BROWN's

picture, details of the event, and the following representation:

> The reception is being hosted by One Door For Education
> Foundation, Inc., which offers scholarships to underprivileged
> students pursuing education degrees . . . . We are hopeful that you
> will contribute to this worthy cause – any contributions will be
> appreciated.

45.     On or about September 10, 2013, based on fraudulent

misrepresentations and omissions by BROWN and SIMMONS concerning One

Door For Education, donor P.D.C. transmitted via Federal Express (tracking

number 7966 5536 4214) a $28,700 check written to One Door For Education

(check number 17205), from the Middle District of Florida to SIMMONS's home

address in Laurel, Maryland.

46.     On or about January 16, 2014, based on fraudulent

misrepresentations and omissions by BROWN and SIMMONS, donor J.P.

transmitted via the United States Postal Service a $10,000 check written to One

Door For Education and to the attention of BROWN, from the Middle District of

Florida to SIMMONS's home address in Laurel, Maryland.   On or about the date

J.P. transmitted the $10,000 check, there was a negative balance in the One Door

For Education Capital One bank account in the amount of $201.92.

47.     On or about May 15, 2014, SIMMONS transmitted and caused to be

transmitted to a potential One Door For Education donor a document with the

13

subject line "Financial Support," which stated, "As we discussed, there are 4 ways you can help."   The message contained the following four options:   Friends of Corrine Brown Campaign, One Door For Education Foundation, Corrine Brown Legal Expense Trust, and Florida Delivers Leadership PAC.   Under One Door For Education—the second option—the message contained Wiley's home address and the description "unlimited amount; both personal and/or corporate checks accepted."

48.     In or about August and September 2014, BROWN, SIMMONS, and Wiley transmitted and caused to be transmitted an invitation for a reception honoring BROWN in Washington, D.C. that contained the same representation referenced in Paragraph 44.

49.     On or about September 10, 2014, SIMMONS emailed One Door For Education donor J.H., a car dealer in Jacksonville, Florida, and attached a Federal Express label (tracking number 7711 0493 0751), which J.H. used on or about the same day to transmit a $7,000 check written to One Door For Education (check number 107532), from the Middle District of Florida to the address of Wiley's employer in Virginia.   Although BROWN and SIMMONS had falsely represented to J.H. that the donation would be used to support One Door For Education's charitable mission, BROWN and SIMMONS, in fact, caused the $7,000 donation to be used toward an event held for BROWN in a luxury suite at FedEx Field in Landover, Maryland, during an NFL game between the Jacksonville Jaguars and

14

Washington Redskins on or about September 14, 2014.   No money was raised for scholarships or educational opportunities for disadvantaged students at the event.

50.     On or about September 15, 2014, based on fraudulent misrepresentations and omissions by BROWN and SIMMONS concerning One Door For Education, donor B.H. transmitted via Federal Express (tracking number 7711 5931 3016) a $10,000 check written to One Door For Education (check number 300751), from the Middle District of Florida to Wiley's address in Leesburg, Virginia.

51.     On or about September 9, 2015, SIMMONS emailed M.B.J., an employee of One Door For Education donor B.H., copying Wiley and including Person B on the "To" line of the email, and attached an invoice for a $10,000 B.H. donation to One Door For Education "For Annual Student Scholarships."   The body of the email read, in part, ". . . you made today 'a good day.'"

52.     On or about September 16, 2015, SIMMONS emailed M.B.J., an employee of One Door For Education donor B.H., and attached a Federal Express label (tracking number 7745 2082 2323) for M.B.J. and B.H. to use to send a $10,000 donation to One Door For Education.   The return address on the Federal Express label was BROWN's congressional office in Washington, D.C., and the address on the label where the donation was to be delivered was SIMMONS's home address in Laurel, Maryland.

53.     On or about September 16, 2015, based on fraudulent misrepresentations and omissions by BROWN and SIMMONS concerning One

Door For Education, donor B.H. transmitted via Federal Express (tracking number 7745 2082 2323) a $10,000 check written to One Door For Education (check number 329718), from the Middle District of Florida to SIMMONS's home address in Laurel, Maryland.

54.     On or about December 14, 2015, BROWN and SIMMONS transmitted and caused to be transmitted to a One Door For Education donor a document bearing BROWN's signature and the subject line "Financial Support." The document stated, "There are 4 ways you can help," and listed the same options described in paragraph 47.   One Door For Education was listed as the first option along with Wiley's address and the description "unlimited amount; both personal and/or corporate checks accepted."

### Cash Deposits into BROWN's Personal Bank Accounts

55.     On or about September 7, 2012—less than one month after the second One Door For Education bank account was opened, and seven days after BROWN and SIMMONS caused the initial $25,000 deposit to be credited to the One Door For Education account at Capital One—SIMMONS withdrew $800 in cash, the maximum allowable withdrawal amount from a Capital One ATM in one day, from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland.   The same day, BROWN deposited $800 in cash into her Congressional Federal Credit Union account.

56.     On or about September 14, 2012, Person A deposited a One Door For Education check in the amount of $4,000 into the Entity A bank account.   On

16

or about September 19, 2012, Person A wrote a $3,100 check to cash from Entity A bank account, and, on or about the same day Person A deposited $2,000 in cash into BROWN's Bank of America personal bank account at a branch in Jacksonville, Florida. Approximately one minute later, Person A deposited $500 in cash into Person B's Bank of America account at the same branch.

57. On or about October 19 and 20, 2012, SIMMONS withdrew $800 in cash each day from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and on or about October 19 and 22, SIMMONS deposited $1,000 and $800 in cash, respectively, into BROWN's Bank of America personal bank account.

58. On or about February 25, 2013, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about the same day, SIMMONS deposited $800 in cash into BROWN's Bank of America personal bank account.

59. On or about June 29 and 30 and July 1, 2013, SIMMONS withdrew $800 in cash each day, for a total of $2,400, from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about July 2, 2013, SIMMONS deposited $2,100 in cash into BROWN's Bank of America personal account. That same day, BROWN issued a personal check for $2,057.00 to the IRS for taxes owed as a result of BROWN's filing an Amended U.S. Individual Tax Return (Form 1040X) for Tax Year 2010.

60.     On or about July 18, 19, and 21, 2013, SIMMONS withdrew $800 in cash each day from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and on or about July 22 and 23, 2013, $1,000 cash was deposited each day into BROWN's Bank of America personal account at branches in Jacksonville, Florida.

61.     On or about July 29, 2013, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about the same day, SIMMONS deposited $800 in cash into BROWN's Bank of America personal bank account.

62.     On or about August 1, 2013, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about the same day, $500 in cash was deposited into BROWN's Congressional Federal Credit Union personal bank account.

63.     On or about August 5, 2013, Person A deposited a One Door For Education check in the amount of $3,055.16 into the Entity A bank account.   On or about August 6, 2013, Person A wrote a $3,000 check to cash from the Entity A bank account, and, on or about the same day, Person A deposited $2,000 in cash into BROWN's Bank of America personal bank account at a branch in Jacksonville, Florida.

64.     On or about August 9, 2013, while BROWN and Person B were traveling together in Los Angeles, California, a One Door For Education check in

18

the amount of $3,000, made payable to the Bank of America account number of Person B, and containing "Children summer camps" in the memo line, was cashed at a Bank of America branch near Los Angeles, California.   On or about the same day, $3,000 in cash was deposited into Person B's Bank of America account at the same branch, and $1,000 was transferred from Person B's account to BROWN's Bank of America personal account.   Between on or about August 7 and on or about August 12, 2013, BROWN accrued at least $2,000 in credit card charges related to purchases in Los Angeles and Beverly Hills, California.

65.   On or about August 9, 10, 11, 12, and 13, 2013, SIMMONS withdrew $800 in cash each day (for a total of $4,000 in cash) from the One Door For Education account at a Capital One branch in Laurel, Maryland, and, on or about August 13, 2013, SIMMONS deposited $3,000 in cash into BROWN's Bank of America personal bank account.

66.   On or about August 13, 2013, Person A deposited a One Door For Education check in the amount of $2,086.10 into the Entity A bank account.   On or about the same day, Person A wrote a $500 check to cash from the Entity A bank account and deposited $400 in cash into BROWN's Bank of America personal bank account at a branch in Jacksonville, Florida.   On or about August 14, 2013, Person A wrote a $1,250 check to cash from the Entity A bank account and deposited the same amount in cash into BROWN's Bank of America personal bank account at a branch in Jacksonville, Florida.

67.     On or about August 26, 2013, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about the same day, SIMMONS deposited $800 in cash into BROWN's Bank of America personal bank account.

68.     On or about September 3, 2013, Person A deposited a One Door For Education check in the amount of $2,500 into the Entity A bank account.   On or about September 5, 2013, Person A wrote an $1,800 check to cash from the Entity A bank account and deposited $900 in cash into BROWN's Bank of America personal bank account at a branch in Jacksonville, Florida, and, at the same time, deposited another $900 in cash into Person B's Bank of America account at the same branch.

69.     On or about September 9, 2013, Person A deposited a One Door For Education check in the amount of $2,000 into the Entity A bank account.   On or about September 11, 2013, Person A wrote a $1,700 check to cash from the Entity A bank account and deposited $1,000 in cash into BROWN's Bank of America personal bank account at a branch in Jacksonville, Florida, and, approximately one minute prior, deposited $500 cash into Person B's Bank of America account at the same branch.

70.     On or about January 24, 2014, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about the same day,

SIMMONS deposited $800 in cash into BROWN's Bank of America personal bank account.

71.     On or about June 11, 2014, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about the same day, $500 in cash was deposited into BROWN's Congressional Federal Credit Union personal bank account.

72.     On or about September 15, 2014, BROWN solicited a $10,000 payment from One Door For Education donor R.L., an owner of private medical facilities in or around New Jersey, based on BROWN's false representation that the payment was necessary to complete production of a Florida-based magazine's October 2014 commemorative issue featuring BROWN.   R.L. wrote "printing" in the memo line of check number 2166 and, at BROWN's direction, left the payee line blank.   On or about September 16, 2014, BROWN and SIMMONS caused a Federal Express package (tracking number 7711 7582 2205) to be sent from BROWN's congressional office in Washington, D.C. to the attention of Person A at BROWN's district office in Jacksonville, Florida, containing the $10,000 check from R.L.   On or about September 17, 2014, Person A received R.L.'s $10,000 check—which SIMMONS made payable to Entity A—and deposited the check into the Entity A bank account.   BROWN and SIMMONS caused Person A to dispense the $10,000 from R.L. as follows:

       a.     On or about September 22, 2014, Person A wrote a $4,000 check to cash from the Entity A bank account and, on or about the same day, deposited $3,000 in cash into BROWN's personal bank account and $1,000 in cash into Person B's personal bank account at a Bank of America branch in Jacksonville, Florida.

       b.     On or about September 23, 2014, Person A wrote a $3,500 check to cash from the Entity A bank account and, on or about the same day, deposited $2,000 in cash into Person B's personal bank account at a Bank of America branch in Jacksonville, Florida.

       c.     On or about September 29, 2014, Person A wrote a $2,500 check to cash from the Entity A bank account and, on or about the same day, deposited $1,000 in cash into BROWN's personal bank account and $1,000 in cash into Person B's personal bank account at a Bank of America branch in Jacksonville, Florida.

73.    On or about September 20 and 22, 2014, SIMMONS withdrew $800 in cash each day from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about September 22, 2014, SIMMONS deposited $1,600 in cash into BROWN's Bank of America personal bank account.

74.     On or about March 4 and March 17, 2015, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about each of the same days, a corresponding $800 cash deposit was made into BROWN's Congressional Federal Credit Union personal bank account.

75.     On or about July 20, July 24, and July 28, 2015, SIMMONS withdrew $800 in cash each day from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about each of the same days, SIMMONS deposited $800, $800, and $700 in cash, respectively, into BROWN's Bank of America personal bank account.

76.     On or about September 16, 2015, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch near SIMMONS's residence in Laurel, Maryland, and, on or about the same day, SIMMONS deposited $500 in cash into BROWN's Bank of America personal bank account.

77.     On or about September 26, 2015, SIMMONS withdrew $800 in cash from the One Door For Education account at a Capital One branch in Laurel, Maryland, and, on or about the same day, SIMMONS deposited $500 in cash into BROWN's Bank of America personal bank account.

**Examples of Additional Expenditures Benefitting BROWN, SIMMONS, and Wiley**

78.    On or about September 28, 2012, $365.80 in One Door For Education funds was used to purchase a commercial airline ticket for SIMMONS to travel from Baltimore, Maryland to Jacksonville, Florida.

79.    On or about October 15, 2012, $2,643.50 in One Door For Education funds was used to pay for repair work on BROWN's personal vehicle and Person B's personal vehicle.

80.    On or about December 16, 2012, $206.80 in One Door For Education funds was used to purchase a commercial airline ticket for BROWN to travel from Jacksonville, Florida to Fort Lauderdale, Florida.

81.    On or about December 21, 2012, $361.80 in One Door For Education funds was used to purchase a commercial airline ticket for BROWN to travel from Washington, D.C. to Jacksonville, Florida.

82.    On or about June 20, 2013, $1,096.60 in One Door For Education funds was used to pay for repair work on SIMMONS's personal vehicle.

83.    On or about July 12, 2013, $793.80 in One Door For Education funds was used to purchase a commercial airline ticket for SIMMONS to travel from Baltimore, Maryland to Jacksonville, Florida.

84.    On or about August 7, 2013, SIMMONS used $1,911.11 in One Door For Education funds to prepay for airfare and lodging at a luxury hotel in connection with a vacation SIMMONS and Wiley took to Miami Beach, Florida

24

between on or about August 15 and August 18, 2013.   During the trip, SIMMONS and Wiley accrued an additional $418.53 in hotel charges and spent $606.75 for a luxury rental car during the trip.   Both expenses were charged to the One Door For Education debit card.

85.   In or about September 2014, $5,000 in One Door For Education funds was used toward the publishing costs associated with a Florida-based magazine's October 2014 commemorative issue focusing on BROWN.   The cover of the commemorative issue contained a picture of BROWN and the slogan "Corrine Delivers!"   The commemorative issue indicated that it had been paid for by Friends of Corrine Brown, BROWN's campaign committee, when, in fact, One Door For Education funds, among other third-party funds, also were used to pay for the issue.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SEVENTEEN
### (MAIL AND WIRE FRAUD)

## SCHEME AND ARTIFICE

1.      The allegations set forth in Paragraphs 1 – 14, 16 – 33, and 35 – 85 of Count One are incorporated herein.

2.      Between in or about late 2012 and in or about early 2016, in the Middle District of Florida, Virginia, Maryland, Washington, D.C., and elsewhere,

CORRINE BROWN and
ELIAS SIMMONS,

the defendants herein, aided and abetted by each other and Carla Wiley, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud, and for the purpose of obtaining money by means of materially false and fraudulent pretenses, representations, and promises.

## EXECUTION

3.      On or about the dates listed below, in the Middle District of Florida and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises,

CORRINE BROWN and
ELIAS SIMMONS,

the defendants herein, did knowingly deliver, cause to be delivered, and aid and abet the delivery of, by means of a private or commercial interstate carrier:

| COUNT | DATE | MAILING |
|-------|------|---------|
| TWO | June 3, 2013 | Federal Express package sent from Altamonte Springs, Florida to SIMMONS's home in Laurel, Maryland, with tracking number 7999 0946 9798 and containing a check for $5,000 to One Door For Education from donor P.D.C. (check number 17086) |
| THREE | July 2, 2013 | Federal Express package sent from Altamonte Springs, Florida to SIMMONS's home in Laurel, Maryland, with tracking number 7961 4371 4338 containing a check for $5,000 to One Door For Education from donor P.D.C. (check number 17130) |
| FOUR | September 10, 2013 | Federal Express package sent from Altamonte Springs, Florida to SIMMONS's home in Laurel, Maryland, with tracking number 7966 5536 4214 containing a check for $28,700 to One Door For Education from donor P.D.C. (check number 17205) |
| FIVE | September 10, 2014 | Federal Express package sent from Jacksonville, Florida to Reston, Virginia, with tracking number 7711 0493 0751 containing a check for $7,000 to One Door For Education from donor J.H. (check number 105732) |
| SIX | September 15, 2014 | Federal Express package sent from Maitland, Florida to Wiley's home in Leesburg, Virginia, with tracking number 7711 5931 3016 containing a check for $10,000 to One Door For Education from donor B.H. (check number 300751) |
| SEVEN | September 16, 2014 | Federal Express package sent from BROWN's congressional office in Washington, D.C. to the attention of Person A at BROWN's district office in Jacksonville, Florida, with tracking number 7711 7582 2205 containing a check for $10,000 to Entity A from One Door For Education donor R.L. (check number 2166) |

| EIGHT | September 16, 2015 | Federal Express package sent from Orlando, Florida to SIMMONS's home in Laurel, Maryland, with tracking number 7745 2082 2323 containing a check for $10,000 to One Door For Education from donor B.H. (check number 329718) |
|---|---|---|

All in violation of Title 18, United States Code, Sections 1341 and 2.

4.      On or about the dates listed below, in the Middle District of Florida and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises,

CORRINE BROWN and<br>
ELIAS SIMMONS,

the defendants herein, did knowingly transmit, cause to be transmitted, and aid and abet the transmission of, the following writings, signs, signals, pictures, and sounds, by means of wire communication in interstate commerce:

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| NINE | June 18, 2013 | Email from SIMMONS (using an AOL email account) to J.L.W. in the Middle District of Florida, asking J.L.W. to facilitate a donation of $5,000 for a student computer drive and asking J.L.W. to send the donation to Entity B, instead of One Door For Education after J.L.W. learned that One Door For Education was not a section 501(c)(3) organization |
| TEN | August 5, 2013 | Deposit of One Door For Education check number 204 in the amount of $3,055.16 into an Entity A First Atlantic Bank account in Jacksonville, Florida, the funding of which occurred via wire transfer from the state of Georgia |

| ELEVEN | August 13, 2013 | Deposit of One Door For Education check number 164 in the amount of $2,086.10 into an Entity A First Atlantic Bank account in Jacksonville, Florida, the funding of which occurred via wire transfer from the state of Georgia |
|---|---|---|
| TWELVE | September 3, 2013 | Deposit of One Door For Education check number 166 in the amount of $2,500 into an Entity A First Atlantic Bank account in Jacksonville, Florida, the funding of which occurred via wire transfer from the state of Georgia |
| THIRTEEN | September 9, 2013 | Deposit of One Door For Education check number 167 in the amount of $2,000 into an Entity A First Atlantic Bank account in Jacksonville, Florida, the funding of which occurred via wire transfer from the state of Georgia |
| FOURTEEN | September 10, 2014 | Email from SIMMONS (using an AOL email account) to J.H. in the Middle District of Florida, attaching Federal Express label (tracking number 7711 0493 0751) for J.H. to use to send J.H.'s $7,000 donation to One Door For Education |
| FIFTEEN | September 17, 2014 | Deposit of $10,000 check (check number 2166) from donor R.L. into the Entity A First Atlantic Bank account in Jacksonville, Florida, the funding of which occurred via wire transfer from the state of Georgia |
| SIXTEEN | September 9, 2015 | Email from SIMMONS (using an AOL email account) to M.B.J., an employee of B.H., in the Middle District of Florida, attaching an invoice seeking a $10,000 donation for "Annual Student Scholarships" |
| SEVENTEEN | September 16, 2015 | Email from SIMMONS (using an AOL email account) to M.B.J., an employee of B.H., in the Middle District of Florida, attaching a Federal Express label (with tracking number 7745 2082 2323) for M.B.J. and B.H. to use to send a $10,000 donation to One Door For Education |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT EIGHTEEN
### (THEFT OF GOVERNMENT FUNDS)

1.     Person C was a close family member of RONNIE SIMMONS and full-time teacher residing in Jacksonville, Florida, in the Middle District of Florida.

2.     Beginning in or about 2001, and continuing through at least in or about March 2016, SIMMONS used his official position, power, and authority as BROWN's Chief of Staff to arrange for Person C to be paid hundreds of thousands of dollars as an employee of the United States House of Representatives, when Person C performed little or no work for the United States House of Representatives.

3.     Person C's job title was listed on official records of the United States House of Representatives as, among other things, "Staff Assistant," "Outreach Specialist," or "Part-time Employee."

4.     By virtue of Person C's employment with the federal government, Person C was entitled to set aside portions of Person C's compensation toward a retirement account known as a Thrift Savings Plan (TSP).

5.     Between in or about July 2001 and in or about March 2016, the United States House of Representatives disbursed approximately $735,000 in gross compensation to Person C.

6.     Between in or about July 2009 and in or about January 2016, approximately $96,000 in net compensation was deposited into bank accounts associated with Person C.   During this same period of time, Person C also obtained two loans, totaling approximately $73,000 and drawn from funds

maintained in Person C's TSP.   The loan proceeds similarly were deposited into the same bank accounts associated with Person C.

7.      Between in or about 2012 and in or about at least January 2016, SIMMONS maintained joint signatory authority with Person C for one of the bank accounts into which Person C's federal government compensation and TSP loan proceeds were deposited.

8.      Between in or about 2009 and in or about at least January 2016, SIMMONS used for his personal benefit at least $80,000 in funds disbursed by the United States House of Representatives to Person C.   Among other things, SIMMONS transferred funds to bank accounts in SIMMONS's name, made payments toward a boat loan in SIMMONS's name, and made payments toward SIMMONS's credit card balances.

9.      From in or about July 2011 to at least in or about January 2016, in the Middle District of Florida and elsewhere, the defendant,

ELIAS SIMMONS

did knowingly steal, purloin and convert to his use and the use of another more than $1,000 of money of the United States and the United States House of Representatives, with the intent to deprive the United States and the United States House of Representatives of the use and benefit of such money, that is, SIMMONS caused the United States and the United States House of Representatives to disburse government funds to Person C to which Person C was not entitled, and which SIMMONS and Person C used for their personal benefit.

31

All in violation of Title 18, United States Code, Sections 641 and 2.

## COUNT NINETEEN
## (SCHEME TO CONCEAL MATERIAL FACTS)

1.      The allegations set forth in Paragraphs 1 – 14, 16 – 33, and 35 – 85
of Count One are incorporated herein.

2.      The Ethics in Government Act of 1978 required all Members of the
United States House of Representatives and certain senior staff of such Members
to file an annual financial disclosure form reporting, among other things, income
from the prior calendar year.    These financial disclosure forms were required to be
submitted to and filed with the Clerk of the United States House of
Representatives, an office within the Legislative Branch, and were available to the
public.

3.      A purpose of the financial disclosure forms was to promote public
confidence in the United States House of Representatives and its Members and
senior staff by providing the public with the information necessary to evaluate and
consider official conduct by Members of the United States House of
Representatives and their senior staff in light of their income and financial
interests, among other things.

4.      For calendar years 2012, 2013, 2014, and 2015, the Ethics in
Government Act of 1978 mandated that BROWN file an annual financial disclosure
form.

5.      The annual financial disclosure form in each year required that
BROWN disclose "earned income," which reporting category was described as

33

"intended to be comprehensive" and included "all income from whatever source derived."

6.      From in or about 2012 through in or about 2016, in the Middle District of Florida and elsewhere, the defendant,

CORRINE BROWN,

knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device, material facts in a matter within the jurisdiction of the Legislative Branch. Specifically, in reports she filed for years 2012, 2013, 2014, and 2015, BROWN failed to identify reportable income that she received from One Door For Education, Entity A, and Friends of Corrine Brown.

7.      It was part of the scheme to conceal that BROWN obtained payments from Entity A and Friends of Corrine Brown, as well as fraudulent payments from One Door For Education funds for her personal benefit via, among other means, substantial cash deposits into her personal bank accounts and direct expenditures for airfare and car repairs, without reporting such income as required on her annual financial disclosure forms covering calendar years 2012, 2013, 2014, and 2015.

All in violation of Title 18, United States Code, Section 1001(a)(1).

### COUNT TWENTY
### (SCHEME TO CONCEAL MATERIAL FACTS)

1.      The allegations set forth in Paragraphs 1 – 14, 16 – 33, and 35 – 85 of Count One, Paragraphs 1 – 8 of Count Eighteen, and Paragraphs 2 – 3 of Count Nineteen are incorporated herein.

2.      For calendar years 2012, 2013, and 2014, the Ethics in Government Act of 1978 mandated that SIMMONS file an annual financial disclosure form.

3.      The annual financial disclosure form in each year required that SIMMONS disclose "earned income," which reporting category was described as "intended to be comprehensive" and included "all income from whatever source derived."

4.      From in or about 2012 through in or about 2015, in the Middle District of Florida and elsewhere, the defendant,

ELIAS SIMMONS,

knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device, material facts in a matter within the jurisdiction of the Legislative Branch. Specifically, in an effort to conceal income he obtained from unlawful means, SIMMONS did not disclose any of the reportable income that he received from One Door For Education and Person C in reports he filed for years 2012, 2013, and 2014.

5.      It was part of the scheme to conceal that SIMMONS fraudulently obtained and used One Door For Education funds for his personal benefit via, among other means, substantial cash withdrawals, checks SIMMONS wrote to

35

himself, and debit card purchases for airfare, lodging, car rentals, car repairs, and dining, without reporting such income as required on his annual financial disclosure forms covering calendar years 2012, 2013, and 2014.

6.     It was further part of the scheme to conceal that SIMMONS unlawfully converted federal funds disbursed by the United States and the United States House of Representatives as compensation to Person C by diverting to his own benefit tens of thousands of dollars of such funds from a joint checking account in SIMMONS's and Person C's names, without reporting such income as required on his annual financial disclosure forms covering calendar years 2012, 2013, and 2014.

All in violation of Title 18, United States Code, Section 1001(a)(1).

## COUNT TWENTY-ONE
### (CORRUPT ENDEAVOR TO OBSTRUCT AND IMPEDE THE DUE ADMINISTRATION OF THE INTERNAL REVENUE LAWS)

1.      The allegations set forth in Paragraphs 1 – 14, 16 – 33, and 35 – 85 of Count One are incorporated herein.

2.      For each of Tax Years 2008, 2009, 2010, 2011, 2012, 2013, and 2014, BROWN filed and caused to be filed by her certified public account (CPA), in the Middle District of Florida, a U.S. Individual Income Tax Return (Form 1040), with the IRS.

3.      Line 22 of each Form 1040 required BROWN to report her total income for each tax year.

4.      Line 40 of each Form 1040 required BROWN to report the total of all itemized deductions claimed for each tax year.   Because BROWN claimed itemized deductions on Line 40 for each such tax year, BROWN was also required to file a Schedule A, which included a specific breakdown of the types and amounts of itemized deductions BROWN claimed.

5.      For each of Tax Years 2008, 2009, 2010, 2011, 2012, 2013, and 2014, BROWN submitted a Schedule A claiming significant gifts to charity.   Line 19 of Schedule A reported the total of BROWN's claimed gifts to charity for each such tax year, ranging from approximately $20,000 to approximately $30,000 in purported charitable giving.

6.     Entity C was an entity in Jacksonville, Florida that promoted itself as providing training and offering various other services in support of other non-profit entities.   The principal of Entity C was also an employee of Entity B.

7.     Entity D was a non-profit higher education institution in Jacksonville, Florida.

8.     Entity E was a non-profit foundation in Jacksonville, Florida that sought to reduce homelessness through job training and employment.

9.     . Between on or about October 15, 2009 and on or about October 15, 2015, in the Middle District of Florida and elsewhere, defendant

CORRINE BROWN

did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws by, among other things:

        a.     failing to include on line 22 of her Forms 1040 income associated with, among other things, significant cash deposits into her personal bank accounts, including deposits of cash from One Door For Education funds, as well as other funds originating in, or passing through, bank accounts in the name of Entity A, Entity B, Entity C, and Friends of Corrine Brown; and

        b.     fraudulently inflating and fabricating her total gifts to charity on line 19 of Schedule A by, among other things, falsely claiming donations to One Door For Education, falsely claiming

38

donations to local churches and other non-profit entities located in the Middle District of Florida, and causing two non-profit entities to create false letters in support of BROWN's claims that she had made certain charitable donations.

## CORRUPT ACTS

10. In furtherance of BROWN's corrupt endeavor to obstruct and impede the due administration of the revenue laws, the following acts, among others, occurred in the Middle District of Florida and elsewhere:

**Tax Year 2008**

11. On or about October 15, 2009, BROWN filed and caused to be filed by her CPA a 2008 Form 1040, with the IRS, which falsely reported on line 19 of Schedule A $23,505 in total gifts to charity.

12. On or about July 7, 2010, in response to an official audit of BROWN's 2008 Form 1040 by the IRS, BROWN caused Entity D to generate a letter stating that BROWN had donated conference room furniture and accessories valued at $12,000 during 2008, when, as BROWN well knew, she had not made such donation.

13. On or about July 9, 2010, BROWN caused the fraudulent letter from Entity D to be submitted to the revenue agent conducting the audit of BROWN's 2008 Form 1040.

**Tax Year 2009**

14.     On or about October 14, 2010, BROWN filed and caused to be filed by her CPA a 2009 Form 1040, with the IRS, which falsely reported:

a.     On line 22, total income of $176,509, which omitted additional income arising from significant cash deposits BROWN made or caused to be made to her personal bank accounts during 2009; and

b.     On line 40, total itemized deductions of $70,162, including, as reflected on line 19 of Schedule A, $26,120 in total gifts to charity for 2009.

15.     Between in or about July and October 2010, BROWN provided and caused to be provided false information to her CPA regarding her purported charitable giving during 2009, including a letter from Entity D, which BROWN caused Entity D to generate, stating that BROWN had donated executive office furniture and accessories valued at $8,000 during 2009, when, as BROWN well knew, she had not made such donations.

16.     BROWN further caused her CPA to include the false information in the total gifts to charity reflected on line 19 of Schedule A and submitted to the IRS as part of BROWN's 2009 Form 1040.

**Tax Year 2010**

17.     On or about October 14, 2011, BROWN filed and caused to be filed by her CPA a 2010 Form 1040, with the IRS, which falsely reported:

    a.     On line 22, total income of $176,900, which omitted additional income arising from significant cash deposits BROWN made or caused to be made to her personal bank accounts during 2010, including deposits of funds originating in, or passing through, bank accounts associated with Entity B and Entity C; and

    b.     On line 40, total itemized deductions of $64,106, including, as reflected on line 19 of Schedule A, $24,721 in total gifts to charity for 2010.

18.    Between in or about August 2011 and October 2011, BROWN provided and caused to be provided false information to her CPA regarding her purported charitable giving during 2010, including:

    a.     Claiming that she had donated $9,500 to Entity D, during 2010, when, as BROWN well knew, she had not made such donation; and

    b.     Providing two letters from Entity B, both dated August 17, 2011, in support of a purported charitable donation of $10,000.   After BROWN's CPA informed BROWN that the first letter was insufficient to justify the deduction based on Entity B's representation that BROWN had donated $10,000 worth of her "time," BROWN provided to the CPA the second letter claiming that BROWN instead had made an in-kind

donation of $10,000 in household items, when, as BROWN well knew, she had not made such donation.

19.     BROWN further caused her CPA to include the false information in the total gifts to charity reflected on line 19 of Schedule A and submitted to the IRS as part of BROWN's 2010 Form 1040.

20.     On or about July 8, 2013, BROWN filed an Amended U.S. Individual Tax Return, Form 1040X, for 2010 (2010 Form 1040X).  The 2010 Form 1040X did not reflect any amendments to line 22 (total income) or line 19 of Schedule A (total gifts to charity).

**Tax Year 2011**

21.     On or about October 15, 2012, BROWN filed and caused to be filed by her CPA a 2011 Form 1040, with the IRS, which falsely reported:

> a.     On line 22, total income of $178,123, which omitted additional income arising from significant cash deposits BROWN made or caused to be made to her personal bank accounts during 2011, including deposits of funds originating in, or passing through, bank accounts associated with Entity A, Entity B, and Entity C; and
>
> b.     On line 40, total itemized deductions of $69,754, including, as reflected on line 19 of Schedule A, $29,620 in total gifts to charity for 2011.

42

22.     In or about September 2012 and October 2012, BROWN provided and caused to be provided false information to her CPA regarding her purported charitable giving during 2011, including a letter dated October 13, 2012 that BROWN caused Entity D to generate stating that BROWN had donated $9,500 to the entity during 2011, when, as BROWN well knew, she had not made such donation.   BROWN further caused her CPA to include the false information in the total gifts to charity reflected on line 19 of Schedule A and submitted to the IRS as part of BROWN's 2011 Form 1040.

**Tax Year 2012**

23.     On or about October 14, 2013, BROWN filed and caused to be filed by her CPA a 2012 Form 1040, with the IRS, which falsely reported:

        a.     On line 22, total income of $178,646, which omitted additional income arising from significant cash deposits BROWN made or caused to be made to her personal bank accounts during 2012, including deposits of funds originating in, or passing through, bank accounts associated with One Door For Education and Entity A; and

        b.     On line 40, total itemized deductions of $61,482, including, as reflected on line 19 of Schedule A, $30,920 in total gifts to charity for 2012.

24.     In or about September 2013 and October 2013, BROWN provided and caused to be provided false information to her CPA regarding her purported

43

charitable giving during 2012, including stating that she had donated $12,500 by cash or check to One Door For Education, when, as BROWN well knew, she had not made such donation. BROWN further caused her CPA to include the false information in the total gifts to charity reflected on line 19 of Schedule A and submitted to the IRS as part of BROWN's 2012 Form 1040.

### Tax Year 2013

25.     On or about October 15, 2014, BROWN filed and caused to be filed by her CPA a 2013 Form 1040, with the IRS, which falsely reported:

        a.     On line 22, total income of $179,078, which omitted additional income arising from significant cash deposits BROWN made or caused to be made to her personal bank accounts during 2013, including deposits of funds originating in, or passing through, bank accounts associated with One Door For Education and Entity A; and

        b.     On line 40, total itemized deductions of $62,222, including, as reflected on line 19 of Schedule A, $27,655 in total gifts to charity for 2013.

26.     In or about September 2014 and October 2014, BROWN provided and caused to be provided false information to her CPA regarding her purported charitable giving during 2013, including the following purported donations to Entity B, two local churches (Church A and Church B), and One Door For Education:

44

| Claimed Donee | Amount Claimed | Actual Donation |
|---|---|---|
| Entity B | $10,000 | $0 |
| Church A | $6,100 | $3,445 |
| Church B | $2,500 | $50 |
| One Door For Education | $5,000 | $0 |

27.    BROWN further caused her CPA to include the false information in the total gifts to charity reflected on line 19 of Schedule A and filed with the IRS as part of BROWN's 2013 Form 1040.

**Tax Year 2014**

28.    On or about October 15, 2015, BROWN filed and caused to be filed by her CPA a 2014 Form 1040, with the IRS, which falsely reported:

a.    On line 22, total income of $175,645, which omitted additional income arising from significant cash deposits BROWN made or caused to be made to her personal bank accounts during 2014, including deposits of funds originating in, or passing through, bank accounts associated with One Door For Education, Entity A, and Friends of Corrine Brown; and

b.    On line 40, total itemized deductions of $57,619, including, as reflected on line 19 of Schedule A, $30,300 in total gifts to charity for 2014.

29.    In or about September 2015 and October 2015, BROWN provided and caused to be provided false information to her CPA regarding her purported charitable giving during 2014, including the following purported donations to two

45

local non-profit entities (Entity B and Entity E), two local churches (Church A and Church B), and One Door For Education:

| Claimed Donee | Amount Claimed | Actual Donation |
|---|---|---|
| Entity B | $6,500 | $0 |
| Entity E | $3,500 | $0 |
| Church A | $7,200 | $4,378 |
| Church B | $2,500 | $0 |
| One Door For Education | $7,000 | $0 |

30.   BROWN further caused her CPA to include the false information in the total gifts to charity reflected on line 19 of Schedule A and filed with the IRS as part of BROWN's 2014 Form 1040.

All in violation of Title 26, United States Code, Section 7212(a).

## COUNT TWENTY-TWO
### (FILING FALSE RETURN)

1.      The allegations set forth in Paragraphs 1 – 8 and 23 – 24 of Count Twenty-One are incorporated herein.

2.      On or about October 14, 2013, in the Middle District of Florida and elsewhere, defendant

CORRINE BROWN

did willfully make, and subscribe, and cause to be made and subscribed, a 2012 U.S. Individual Income Tax Return, IRS Form 1040, which was verified by a written declaration that was made under penalties of perjury, and which she did not believe to be true and correct as to every material matter, in that the return was prepared and signed in the Middle District of Florida and was filed with the IRS, and reported her total income on line 22 of Form 1040 as $178,646 and her total gifts to charity on line 19 of Schedule A as $30,920, whereas, as she then and there knew and believed her total income was greater than reported and her total gifts to charity were lower than reported.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-THREE
## (FILING FALSE RETURN)

1.     The allegations set forth in Paragraphs 1 – 8 and 25 – 27 of Count Twenty-One are incorporated herein.

2.     On or about October 15, 2014, in the Middle District of Florida and elsewhere, defendant

### CORRINE BROWN

did willfully make, and subscribe, and cause to be made and subscribed, a 2013 U.S. Individual Income Tax Return, IRS Form 1040, which was verified by a written declaration that was made under penalties of perjury, and which she did not believe to be true and correct as to every material matter, in that the return was prepared and signed in the Middle District of Florida and was filed with the IRS, and reported her total income on line 22 of Form 1040 as $179,078 and her total gifts to charity on line 19 of Schedule A as $27,655, whereas, as she then and there knew and believed her total income was greater than reported and her total gifts to charity were lower than reported.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-FOUR
## (FILING FALSE RETURN)

1.    The allegations set forth in Paragraphs 1 – 8 and 28 – 30 of Count Twenty-One are incorporated herein.

2.    On or about October 15, 2015, in the Middle District of Florida and elsewhere, defendant

CORRINE BROWN

did willfully make, and subscribe, and cause to be made and subscribed, a 2014 U.S. Individual Income Tax Return, IRS Form 1040, which was verified by a written declaration that was made under penalties of perjury, and which she did not believe to be true and correct as to every material matter, in that the return was prepared and signed in the Middle District of Florida and was filed with the IRS, and reported her total income on line 22 of Form 1040 as $175,645 and her total gifts to charity on line 19 of Schedule A as $30,300, whereas, as she then and there knew and believed her total income was greater than reported and her total gifts to charity were lower than reported.

All in violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE

1.      The allegations contained in Count One through Count Eighteen of this Indictment are incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      Upon conviction of a conspiracy to violate sections 1341 and/or 1343, in violation of Title 18, United States Code, Section 1349, and/or upon conviction of a violation of Title 18, United States Code, Sections 1341, 1343 and/or 641, the defendants,

CORRINE BROWN and
ELIAS SIMMONS,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

3.      If any of the property described above, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

50

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

28, United States Code, Section 2461(c).


A TRUE BILL,

Foreperson

A. LEE BENTLEY, III
United States Attorney
Middle District of Florida

By: _____
A. Tysen Duva
Assistant United States Attorney

By: _____
Michael J. Coolican
Assistant United States Attorney

By: _____
Roger B. Handberg, III
Assistant United States Attorney
Chief, Criminal Division (North)


RAYMOND HULSER
Public Integrity Section

By: _____
Eric G. Olshan
Deputy Chief

52

FORM OBD-34
APR 1991

No. 2015-02

## UNITED STATES DISTRICT COURT
### Middle District of Florida
### Jacksonville Division

### THE UNITED STATES OF AMERICA

vs.

### CORRINE BROWN
### ELIAS SIMMONS

## INDICTMENT

Violations:
Ct. 1:          18 U.S.C. § 1349
Cts. 2 – 8:     18 U.S.C. §§ 1341 & 2
Cts. 9 – 17:    18 U.S.C. §§ 1343 & 2
Ct. 18:         18 U.S.C. §§ 641 & 2
Cts. 19 – 20:   18 U.S.C. § 1001(a)(1)
Ct. 21:         26 U.S.C. § 7212(a)
Cts. 22 – 24:   26 U.S.C. § 7206(1)

A true bill,

_____
Foreperson

Filed in open court this ___6th___ day

of July, 2016.

_____
Clerk

Bail   $_____