UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                        Case No. 3:16-cr-93-J-32JRK

CORRINE BROWN
ELIAS SIMMONS

UNITED STATES OF AMERICA

v.                                        Case No. 3:16-cr-34-J-32JRK

CARLA WILEY

## UNITED STATES' SENTENCING MEMORANDUM

## I.     THE CONVICTIONS

Leaders of American democracy owe a duty to the public to act within the

law, uphold the highest ethical standards, and conduct themselves beyond reproach.

Corrine Brown failed in those areas.   She became corrupt.   Society expects courts to

punish convicted and corrupt politicians.   If the legal system does not do so, our

system of justice loses credibility, and the public is left with the impression that there

are some citizens who are truly above the law.   This cannot be the case.[1]

---

[1] The United States submits this memorandum as the omnibus sentencing memorandum for all three defendants in the two referenced cases.   Exhibits 1 through 13 consist of all referenced trial exhibits in the sentencing memorandum.   Exhibit 1 consists of all referenced trial exhibits in the "1" series.   Exhibit 2 is all referenced trial exhibits under the next referenced trial exhibit number in sequential order (the "7" series). This numbering method continues through Exhibit 13.   As such, the trial exhibits are not filed in the order referenced in the Sentencing Memorandum.   Exhibit 14 is a chart of public corruption/fraud cases involving convicted Members of the United States House of Representatives (and one additional Jacksonville Division case) over the prior approximately sixteen years.

Corrine Brown, a Member of the United States House of Representatives for twenty-four years, was convicted by a fair and impartial jury of eighteen felony counts, one of which (Count Twenty-One) alleged that Brown concocted a scheme to obstruct and impede the Internal Revenue Service (IRS) for seven years - - approximately 30% of Brown's tenure in Congress.   The tax fraud scheme spanned three election cycles.   Brown's fraud, scheme to make false statements, and tax fraud convictions illustrate that her entitlement disposition transitioned into criminal conduct that persisted for years.   Brown's culture of fraud became more brazen over time and culminated in the One Door For Education fraud, which was the primary focus of the government's prosecution.

Despite this Court, the United States, and the members of the jury taking great care at every phase to afford Brown due process, Brown chose to ridicule the American system of justice and rule of law both pre- and post-conviction.   On July 8, 2016, moments after Brown's arraignment, she uttered the following on the courthouse steps:   "I represent Orlando.   These are the same agents that was not able to do a thorough investigation of [Omar Mateen] and we ended up with fifty dead people, and over forty-eight people injured.   Same Justice Department.   Same agents.   And with that, I will see you in court."[2]

---

[2] July 8, 2016 – www.news4jax.com/news/investigations/congresswoman-corrine-brown-in-federal-court

July 13, 2016 – www.orlandosentinel.com/news/politics/os-corrine-brown-pulse-shooting-20160713-story

Novelist James Lane Allen is credited with the phrase "adversity does not build character, it reveals it."   When faced with the adversity of a criminal case against her, Brown stooped so low as to state that if the Jacksonville FBI had not spent resources investigating her fraudulent conduct, then the Pulse nightclub tragedy in Orlando on June 12, 2016 would not have occurred.

Brown did not stop there.   During the overt investigation and following her conviction, Brown publicly levied undue criticism at every component of the justice system, showing no remorse:   "I still feel that it was a witch-hunt, and I stand by that,"[3] "[the Department of Justice engaged in a] straight-out, fake prosecution," and "I am having some real concerns about not just the criminal justice system...but even the jury."[4]   Brown has not shown any respect for the law, or this Court's time honored and constitutional processes.

Even prior to the return of the Indictment and before trial, Brown took aim at the government and falsely claimed that the government was motivated to remove her from office.   On January 6, 2016, Brown stated:   "It is not surprising that every time we go through the redistricting process some tangential investigation comes up. I want to assure my constituents that these unfounded and politically motivated

---

[3] May 16, 2017 – www.news4jax.com/news/investigations/corrine-brown/corrine-brown-talks-about-conviction-future-with-tom-wills

[4] May 18, 2017 post-conviction interview with First Coast News – Also reported on www.jacksonville.com/news/metro/2017-05-18/free-now-corrine-brown-back-her-element

actions will not distract me from my critical work of ensuring that the federal forces and rights of the 5th Congressional District are being protected."[5]   Brown also forcefully stated that the prosecution was racially motivated, and as such, the investigation was hidden from then-Attorney General Loretta Lynch.   Brown baselessly claimed that "career prosecutors" moved the case without the Attorney General's knowledge, and that, "[i]t was [Brown's] understanding that [Loretta Lynch] found out the Friday before [the indictment]."[6]   Later, during an interview with Newsone, Brown stated, "And I've done research, and it is amazing to me how they [Department of Justice] target African American Congresspeople."[7]

Corrine Brown's mantra that the prosecution was racially and politically motivated is, and always has been, a complete fabrication meant to distract the public – and no doubt potential jurors – from the very serious allegations against her. The government proved eighteen felony counts beyond a reasonable doubt during a fair trial.   As the Court aptly noted in the Order denying Corrine Brown's post-trial Motion for New Trial (Doc. 200):   "Corrine Brown is entitled to a fair trial with an impartial jury that reaches a verdict in accordance with the law.   That is what she received."

---

[5] www.news4jax.com/news/politics/sources-feds-investigating-corrine-brown

[6] August 5, 2016 - www.facebook.com/tallahasseedemocrat/videos/vb.55529405081/10157222119110

[7] September 22, 2016 - Newsone.com/3544890/florida-rep-corrine-brown-denies-spending-800000-in-charity-money-for-personal-use/

4

Ronnie Simmons, Brown's Chief of Staff during her entire tenure as a House Member, pled guilty to two felony counts in the Indictment (Counts One and Eighteen) with a cooperation plea agreement, and testified in the government's case in chief.   Simmons participated in and facilitated the criminal conduct to enrich Brown and himself.   Simmons primarily benefitted from his sister's bogus employment with Brown's congressional office, an arrangement Simmons created, in part, to siphon taxpayer money to himself.   Simmons likewise betrayed his important office.   Instead of refusing to participate in the One Door fraud, Simmons became a critical cog in the criminal conspiracy and served as a buffer between Brown and a potential criminal prosecution, a buffer that the United States successfully penetrated during this case.   Simmons provided substantial assistance to the United States and is deserving of a reduction in his sentencing guidelines exposure.

Carla Wiley engaged in criminal activity when she gave Simmons the One Door debit card, pre-signed One Door starter checks, and the One Door checkbook in August 2012, and relinquished control of those items to Simmons for over three years.   Wiley herself then stole approximately $182,730.26 from One Door.   Wiley transferred via online access approximately $120,387 from the One Door Capital One account to her personal account (and an account shared with her son).   Wiley used $20,743.26 of One Door money to pay personal expenses.   Wiley also

withdrew $41,600 from the One Door bank account at Capital One branches. Wiley permitted Simmons and Brown to spend large sums of money on eight events for Brown from late 2012 to late 2015, none of which raised money for scholarships or educational opportunities for disadvantaged students.

In March 2016, two months after FBI agents approached and interviewed Wiley, Wiley waived indictment, pled guilty with a cooperation plea agreement to a one count Information alleging the fraud scheme, and cooperated with the government throughout the investigation and prosecution.   Wiley testified before the federal grand jury and (like Simmons) in the government's case in chief during Corrine Brown's trial.   Wiley provided substantial assistance to the United States.

The evidence admitted during Brown's fourteen-day trial proved Brown's calculated decisions to:   (1) defraud and deceive One Door For Education donors; (2) use a buffer (usually Simmons and friend and subordinate Von Alexander) to conduct financial transactions resulting in One Door and other illicit money being deposited into Brown's bank accounts; (3) lie to the United States House of Representatives and conceal cash received from multiple sources during at least four annual reporting periods; and (4) obstruct and defraud the IRS for over seven years.

### A. The Brazen Perpetration of the Fraud Scheme

For years, Brown directed her subordinates (Simmons and Von Alexander) to deposit cash into her bank accounts.   Corrine Brown was the principal beneficiary of

6

the conspiracy to commit fraud charged in Count One.   Bank records and the testimony of FBI Special Agent Vanessa Stelly and FBI Forensic Accountant Kimberly Henderson established that at least $26,860 in cash flowed from One Door For Education donors to Corrine Brown's personal bank accounts.   Ronnie Simmons testified that in addition to depositing One Door cash into Corrine Brown's bank accounts, he (at Brown's direction) withdrew cash from the One Door account and handed the cash to Brown, including at times inside her congressional office.

In addition, over $330,000 raised for One Door was spent on events promoting or otherwise benefitting Corrine Brown, including the TPC golf tournament, outings to an NFL game and a Beyoncé concert, and annual galas that honored the defendant during the week of the annual Congressional Black Caucus Foundation's Annual Legislative Conference (the CBCF-ALC).   The evidence established that none of these events raised money for a single scholarship or educational opportunity for a disadvantaged child.[8]

---

[8]  At trial, Brown focused on testimony from Simmons that both he and Brown believed that certain events funded by One Door had a charitable purpose, inasmuch as the events had the potential to raise money for scholarships.   However, there is no evidence that these fundraisers – held year after year – actually raised any money for scholarships or educational opportunities.   There was little evidence that Brown, Simmons, or Wiley, spent One Door money on many charitable pursuits.   The facts belie Simmons' rationalizations about his good intentions and his speculation that the defendant shared his good intentions.   Hundreds of thousands of dollars of One Door money was spent on numerous events that raised no money for the purported benevolent purpose.   Brown's intent is highlighted by her weak attempts to conflate the success of her personal gala along with one of the main purposes of the CBCF-ALC weekend - to raise money that would fund student scholarships.   The juxtaposition here is telling.   The CBCF raised money for underprivileged students via the Phoenix Awards fundraising dinners.   Corrine Brown's annual parties, paid for in large part by One Door, never raised a dime for scholarships.   During Brown's solicitations for donations for these events, she routinely received One Door cash in her bank accounts.   Had Brown not promoted these events as fundraisers for One Door, she would not have had access to One Door cash.   The purported One Door fundraising events and Brown's access to One Door cash go hand in hand.

Brown participated firsthand in raising significant funds for One Door. Simmons testified that in 2012, One Door was introduced to Brown – not as a charity worthy of support – but as Wiley's non-profit that the defendant and Simmons could use to raise money for Corrine Brown's annual celebration (of herself) during the CBCF-ALC.   Within days of learning about One Door, Brown (without even inquiring or discussing One Door with Carla Wiley) began fundraising for One Door, touting its charitable and educational focus.   Within seven days of receiving the first $25,000 donation (which helped finance Brown's event during the September 2012 Democratic National Convention)[9], Simmons handed Brown her first $800 in cash from One Door, which Brown personally deposited into her account at Congressional Federal Credit Union.

Brown never had any intention to raise money via One Door for disadvantaged students in Jacksonville, or anywhere.   Had she done so, lives of inner city students in the 5th Congressional District (including portions of Jacksonville) could have been enhanced.   The real travesty of this case is what One Door could have been.   Corrine Brown had the power, willing donation base, and clear opportunity to transform One Door into a life changing charity.   One Door

---

[9] Government witness Tandy Bondi testified and the evidence illustrated that the Community Leadership PAC, Inc. wrote a $25,000 check to One Door dated August 31, 2012.   *See* Govt. Trial Exhibit 1H.   The check was credited to the One Door account the same day.   *See* Govt. Trial Exhibit 45A.   Corrine Brown received her first $800 from the One Door account (via Simmons) seven days later on September 7, 2012.   *See* Govt. Trial Exhibits 1K and 45L.

could have been an example of how political leaders whose constituents include large sections of impoverished families and children should go about bettering those communities.   To that end, the testimony of former CSX President, CEO, and Chairman Michael Ward rings true: "To me, education is the best interest you can give anyone."   Doc. 173, p. 200, lines 17-18.   Brown, Simmons, and Wiley not only squandered this opportunity, they abused it for their own benefit.   The voiceless victims in this case are the students who received nothing.

In addition to receiving One Door cash, Brown obtained blank One Door checks from Simmons, who regularly forged Carla Wiley's name.   Bank records and Von Alexander's testimony established that Brown provided checks to Alexander and instructed her how to fill out the checks and route the money through The Alexander Agency account to Corrine Brown's account and (on occasion) to Shantrel Brown's account.   Alexander testified (and the bank records confirmed) that Alexander typically deposited checks (including One Door checks) into The Alexander Agency bank account, then withdrew cash, which Alexander then handed to Corrine Brown, or deposited into the bank accounts of Corrine Brown and Shantrel Brown.

As an example, this conduct occurred just twenty days after One Door received the first $25,000 check from Community Leadership PAC.   On September 14, 2012, Von Alexander deposited a $4,000 One Door starter check made out to

The Alexander Agency and dated September 13, 2012.   On September 19, 2012,

Von Alexander wrote a $3,100 check to cash, and (the same day) deposited $2,000

cash into Corrine Brown's bank account and $500 into Shantrel Brown's bank

account.   *See* Govt. Trial Exhibits 44A and 45L.   Alexander made the deposits one

minute apart.   Alexander testified that she had not done any work for One Door at

that point, should not have received the One Door check, and that Congresswoman

Brown told her how to structure the bank transaction.

Another example occurred on August 5-6, 2013.   The following events

formed the basis of Brown's conviction on Count 10 (wire fraud) in the Indictment.

On August 5, 2013, Von Alexander (at the direction of Corrine Brown) deposited

One Door check number 204 for $3,055.16 made out to The Alexander Agency into

The Alexander Agency bank account.   The following day, Alexander wrote a $3,000

check to cash from The Alexander Agency account and cashed it.   Eleven minutes

later, Alexander (at Brown's direction) deposited $2,000 cash into Brown's bank

account.   *See* Govt. Trial Exhibits 10A-10C and 45L.   Alexander testified that she

often handed the difference to Corrine Brown.   During this time, Simmons

continued to withdraw increments of $800 from the One Door account and either

deposit that money in Brown's bank accounts, or hand it to Brown in an envelope.

*See* Govt. Trial Exhibits 1K and 45L.

Simmons also testified that he handed the defendant one particular One Door

check with only a forged signature of Wiley and the date of July 14, 2013.   That

One Door check (no. 193) was deposited into Shantrel Brown's bank account on

August 9, 2013 at a Bank of America in Beverly Hills, California.   This occurred

while Shantrel Brown and Corrine Brown were shopping in the Los Angeles area.

The $3,000 check was made payable to Shantrel Brown's bank account number

(rather than simply to Shantrel Brown), and the memo line read "children summer

camps."   *See* Govt. Trial Exhibits 1ZZ and 45L.   Despite Corrine Brown's false

assertions during her testimony, the money was not used for children's summer

camps or to purchase backpacks in the Los Angeles garment district for students.

After the deposit, Shantrel Brown transferred $1,000 to her mother's bank account,

which Corrine Brown spent on herself.[10]

This practice of obtaining money by making false and fraudulent

misrepresentations and promises, and then laundering the money through The

Alexander Agency bank account, was not solely limited to One Door checks.   The

jury convicted Corrine Brown of Counts 7 (mail fraud) and 15 (wire fraud), which

alleged the defendant defrauded Dr. Richard Lipsky.   Brown perpetrated this fraud

in a similar fashion.

While in Manhattan with Shantrel Brown on September 15, 2014, Corrine

---

[10]  When asked about the circuitous ways that cash was funneled to Corrine Brown from the One Door account, Simmons explained that writing checks from the One Door account directly to the defendant would have been too easy to detect - in his words, "too obvious."

Brown convinced Dr. Lipsky to give her a blank check for $10,000 to cover certain printing costs associated with the October 2014 commemorative edition of Onyx magazine featuring the defendant leading up to the November 2014 election.   *See* Govt. Trial Exhibit 1SS.   After obtaining the $10,000 check (from the Roseland Ambulatory Surgery Center account) with the payee left blank, Corrine Brown provided the check to Simmons, told Simmons to write "The Alexander Agency" in the payee line (which Simmons did), and then instructed Simmons to send the check to Von Alexander (which Simmons did via Federal Express).   *See* Govt. Trial Exhibits 7A-7B and 15A.   Corrine Brown directed Von Alexander to deposit the check in The Alexander Agency bank account.   Von Alexander testified (and the bank records illustrated) that Brown directed Von Alexander to make a series of cash withdrawals and subsequent deposits into the Bank of America accounts of the defendant and her daughter over a period of three days.   This resulted in $8,000 of the $10,000 being deposited into the personal Bank of America accounts of Corrine and Shantrel Brown.   *See* Govt. Trial Exhibits 15A-15E and 45L.   The money was not used for the publication or printing of the Onyx magazine.   Corrine Brown used the money for her personal benefit.

Further illustrating Corrine Brown's intentional criminal activity is the sheer volume of money she received in certain months.   Government's Exhibit 45Z (admitted into evidence via the testimony of FBI FOA Kimberly Henderson) showed

on a monthly basis from January 2009 through June 2016 how much cash Brown received in her bank account, and demonstrated that if Brown had not received a substantial influx of cash she would have run a deficit in most months.   In other words, without this infusion of cash on a near monthly basis, Brown would have been broke.   As illustrative examples, in August 2013, Brown received $8,250 over and above her congressional salary and State of Florida pension.   In September 2014, Brown received $6,700 in the same manner.   Those numbers are staggering. To profess ignorance (under oath) that this occurred is even more so.

### B.  Corrine Brown's Systemic Tax Fraud Lasted Seven Years

The jury convicted Brown of obstructing and impeding the proper functioning of the IRS (Count 21) for seven years.   Brown used others (including Carolyn Chatman) to gather items to prepare her fraudulent tax returns.   During cross-examination, Brown blamed Portnoy CPA tax preparer and government witness Dawn Wright as the cause of Brown's tax irregularities.[11]   Brown perjured herself on the witness stand when she blamed Wright and others.   Even post-conviction,

---

[11] That Brown blamed CPA Dawn Wright for her criminal tax problems shows that Brown would stop at nothing to try to evade conviction.   Dawn Wright, via her employment with Portnoy CPA, participated in preparing Corrine Brown's Form 1040 Tax Return for approximately seven years.   Wright kept copious notes in her work papers about precisely what Brown (herself) told Wright about certain charitable deductions that Brown claimed each year.   Wright found herself as a government trial witness only because she prepared Corrine Brown's tax returns.   Wright did not seek out the opportunity to testify, and, in fact, expressed nervousness and anxiety about testifying (as many lay witnesses do).   It is no easy task for a citizen lay witness to testify in a federal jury trial, especially in a case like this.   Wright testified truthfully and honestly. For Brown to impugn Dawn Wright's character was truly craven.

Brown has done the complete opposite of showing remorse, accepting responsibility, and attempting to mitigate her criminal activity.

Corrine Brown's counsel publicly likened this case as only being a short portion of a longer movie that is Corrine Brown's life.   The United States disagrees. A seven-year tax fraud that occurred during approximately 30% of Brown's legislative career is no short snippet in a lengthy movie.   What this and the other tax convictions illustrate is systemic corruption, and a willingness to defraud the IRS when the taxpayers and electorate paid Brown's federal salary.   This length of criminal activity requires punishment.

IRS-CI Special Agent Shawn Batsch authenticated summary exhibits (which the Court admitted into evidence and the government highlighted to the jury) regarding the volume of unreported cash that Brown received from tax years 2009 through 2014, and the bogus charitable donation deductions that Brown claimed from tax years 2008 through 2014.   Brown received $141,905 in cash deposits into her bank accounts (separate from her salary and pensions) during the six-year period. One of Brown's explanations for the non-One Door cash she received:   "I had birthdays.   I had Christmas.   You know, and sometimes I had boyfriends.   So I mean, I don't know what you're talking about."   Doc. 179, p. 103, lines 3-5.

Instead of providing an honest answer, Brown chose to quip and lie under oath.   In January 2010 alone (over two years before the start of the One Door

14

scheme), Brown received $11,000 cash deposited into her bank accounts over and above her congressional salary and State of Florida pension.   *See* Govt. Trial Exhibit 45Z.   None of this money could be attributable to her birthday (which is in November) or Christmas, and it is highly unlikely that this money entirely consists of annual exclusion gifts or cash gifts from boyfriends.

Brown also claimed an incredible $195,841 in charitable giving during this seven-year period.   *See* Govt. Trial Exhibit 49B.   Brown's claimed bogus charitable donations over this lengthy period best captures her systemic deceit.   Most alarming is that Brown claimed that she donated money to One Door in 2012 ($12,500), 2013 ($5,000), and 2014 ($7,000) – the same period of time during which she was siphoning hundreds of thousands of dollars from One Door for her personal benefit. *See* Govt. Trial Exhibits 22A, 23A, and 24A.   Portnoy CPA Dawn Wright's specific handwritten note in her work papers on a draft Schedule A (Charitable Contributions by Cash or Check) pertaining to the claimed $12,500 donation to One Door in 2012 that read "verbal per Corrine Brown via phone 10/7/13," led Brown to accuse Wright of getting this information incorrect.   *See* Govt. Trial Exhibit 22E; Trial Transcript Doc.127-1, p. 109, line 21 – p. 110, line 6 and p. 111, line 21 – p. 112, line 9.   In the face of inescapable proof, Brown blamed others (including Dawn Wright), and tried to pass off her tax woes as a "mistake."   Brown also tacitly blamed Wright for her tax problems when testifying about why she hired a new tax preparer to

15

prepare her 2015 return, and that the new tax preparer "looked at [her] taxes comprehensively" (and thus Portnoy CPA and Wright had not).   *Id.* at p. 123, line 6 – p. 124, line 4.

Brown again blamed Portnoy CPA, Dawn Wright and others during cross-examination:

Q.    Did you give $3,500 to the Clara White Mission that year [2014][12]?

A.    No, sir.

Q.    Why is that in your tax return?

A.    Sir, let's be truthful with this.   I did not double-check my taxes. It was a mistake.

Q.    Who made the mistake?

A.    Several people worked on my taxes.

Q.    Who?

A.    Several people.

Q.    Which people?

A.    The company that handled it.

Q.    Dawn Wright?

…

A.    Three people worked on my taxes and maybe some other staffers. Carolyn Chatman was one, Ms. Dawn Wright was one, Ronnie Simmons was one. Doc. 179, p. 10, line 8 – p. 11, line 8.

Brown likewise lied on her tax returns about donations to Edward Waters

---

[12] Clara White Mission CEO and community leader Ju'Coby Pittman testified this donation never occurred.

College[13], Community Rehabilitation Center[14], and her tithes to Bethel Baptist

Church and New Destiny Christian Center[15], all the while blaming others.   This

longstanding criminal conduct and willingness to shift blame underscores why

significant punishment is required in this case.

---

[13] When former Edward Waters College Vice President and Provost Eurmon Hervey expressed apprehension and concern about writing a letter memorializing a claimed furniture donation to EWC, Brown went so far as to show up unannounced at the college and bully Hervey into writing the letter dated October 13, 2012 listing items that Brown purportedly gave to Edward Waters in 2011.   *See* Govt. Trial Exhibit 21PP, Doc. 177, page 268, line 1 – page 273, line 22.   Hervey testified that Brown even walked through the President's conference room suite and pointed out items that were already at the college in 2009 when Hervey began working at EWC.   This was the second round of letters that Brown demanded from Edward Waters.   The first set involved purported furniture donations in 2008 and 2009.   Edward Waters College employees Charlie McCormick and Linda Foster testified that the furniture items set forth in the letters dated July 7, 2010 pertaining to tax years 2008 and 2009 had been at Edward Waters since the late 1990s.   *See* Govt. Trial Exhibits 21M and 21U.   The significance of the July 7, 2010 date is that Brown faced a meeting with an IRS tax auditor two days later (July 9, 2010), during which her designee presented the July 7, 2010 Edward Waters letter, which Brown herself procured and knew was fraudulent.   This vignette illustrates that this elected official was willing to craft an opportunistic lie to evade trouble – even back in 2010.   This willingness is what caught up with, and partially defines, Corrine Brown.

[14] Brown's history of claiming charitable donations to her good friend Reginald Gaffney's (now a sitting member of City Council) section 501(c)(3) organization – CRC – is replete with fraud.   Brown never gave cash or check donations to CRC.   Brown (on an almost annual basis) claimed donations of furniture and other items, claiming that she personally purchased the would-be donations for an average of $28,000 per year. Brown's willingness to go to the CRC well on so many consecutive tax returns further illustrates her own fraudulent intent.

[15] Brown's inflated donations to Bethel Baptist Church in 2013 ($6,100) and 2014 ($7,200) did not match the donation statements admitted into evidence through April Green.   *See* Govt. Trial Exhibits 23A, 23C, 23I, 24A, 24H, 24K, 47B, and 47C.   Brown's actual giving to Bethel was $3,445 in 2013, and $4,378 in 2014. Brown's inflated donations to New Destiny Christian Center in 2012 ($1,000), 2013 ($2,500), and 2014 ($2,500), likewise did not match her actual giving of $50 during those three tax years.   *See* Govt. Trial Exhibit 48.   Corrine Brown testified that the differences between her claimed donations and the Churches' documentation were attributable to separate "love offerings" given in cash at the altar of each Church during those years.   Brown retreated from this position during cross-examination and admitted that her purported love offerings could not make up the difference between her claimed giving and the actual giving.

## II.    SENTENCING GUIDELINES

### A. The Loss – USSG § 2B1.1(b)(1)(H)

The Probation Officer properly calculated the loss in this case as exceeding the $550,000 threshold for all three defendants.   As set forth in the government's submission to the Probation Officer, the government's best estimate of the actual loss (fraud counts) is $664,292.39 for Corrine Brown, $654,292.39 for Carla Wiley, and $1,399,292.39 for Ronnie Simmons (combining the attributable loss as to Simmons for Counts 1 and 18).   Simmons and Wiley have not lodged objections to the overall loss figure, as calculated pursuant to USSG § 2B1.1(b)(1)(H).   Corrine Brown lodged sweeping, general objections to 103 paragraphs in the PSR, including the loss calculation.

The Guidelines do not require a precise determination of loss.   *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011).   "A sentencing court need only make a reasonable estimate of the loss, given the available information."   *United States v. Lee*, 427 F.3d 881, 893 (11th Cir. 2005).   Nevertheless, a sentencing judge may not speculate about the existence of a fact that would result in a higher sentence, and the government must support its loss calculation with "reliable and specific evidence."   *Barrington*, 648 F.3d at 1197 (*quoting United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999)).

18

The Guidelines provide that "loss is the greater of actual loss or intended loss." USSG §2B1.1 cmt. N. 3(A).   "Intended loss" is the pecuniary harm that was intended to result from the offense.   *Id.* at cmt. n. 3(A)(ii).   The "reasonably foreseeable pecuniary harm" is the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."   *Id.* at cmt. n. 3(A)(iv).   The Guidelines acknowledge that a sentencing judge is in a unique position to assess the evidence and estimate the loss and therefore "the court's loss determination is entitled to appropriate deference." *Id.* at cmt. n. 3(C); *see also* 18 U.S.C. § 3742(e) and (f).

Further, in conspiracy cases, a participant may be held responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy.   *United States v. Mateos,* 623 F.3d 1350, 1370 (11th Cir.2010); *see also* U.S.S.G § 1B1.3(a)(1)(B) (stating that, in the case of jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the criminal plan or scheme can count towards offense characteristics).   A court must first make individualized findings concerning the scope of the defendant's criminal activity, and then may consider all reasonably foreseeable acts of others in the jointly undertaken criminal activity.   *Id.*

Here, over $833,000 was deposited into the One Door account.   All three defendants (in one manner or another) had access to and misused One Door and

other funds.   The government's itemization of the loss figure for the fraud counts

include:   (1) $182,730.26 in fraudulent transactions that Carla Wiley engaged in; (2)

$330,000.27 for events that Corrine Brown solicited money for that resulted in no

scholarships or educational opportunities (see Govt. trial Exhibit 1O); (3) $93,536 in

ATM withdrawals from the One Door account; (4) $15,156.20 in expenditures for

Simmons; (5) $11,869.88 in other expenditures for Corrine Brown; (6) $2,936.28 in

expenditures for Simmons' and Wiley's trip to the Fontainebleau Hotel; (7)

$1,422.50 of One Door money to fix Shantrel Brown's vehicle; (8) $16,641.00 in One

Door checks funneled to Corrine and Shantrel Brown; and (9) the $10,000 Roseland

Ambulatory Surgery Center check (as to Brown and Simmons).[16]

The itemized loss figures are sufficiently specific for the Court to find that the

loss attributable to each defendant is above the $550,000 threshold.   In addition, the

figure attributable to each defendant for the fraud counts represents acts that were

reasonably foreseeable to each co-conspirator.   Because Carla Wiley relinquished

control of the One Door debit card and checkbook to Simmons, and Simmons began

withdrawing increments of $800 at a time and funneling that money to Brown, each

defendant should be held accountable for the illegal manner in which One Door

---

[16] The difference in the Corrine Brown and Ronnie Simmons fraud loss figure ($664,292.39) and the Carla Wiley loss figure ($654,292.39) is the $10,000 Roseland Ambulatory Surgery Center check.   There is no evidence that Wiley knew of or could have reasonably foreseen that Brown and Simmons would commit the fraud associated with that check in furtherance of the conspiracy.   Brown received that check from Dr. Lipsky, gave the check to Simmons, Simmons sent the check to Von Alexander, and Von Alexander funneled $8,000 of those funds to Corrine and Shantrel Brown in a series of transactions over three days.

money was spent.   Wiley maintained online access to the One Door account, and thus could see the numerous $800 ATM withdrawals and knew that no such money was used for scholarships or educational opportunities for disadvantaged youth.   All three defendants were intimately involved in the planning of the Corrine Brown events (on which they spent at least $330,000.27 of One Door money).

The loss figures are appropriately calculated.   Corrine Brown's objection to the 14-level enhancement should be overruled.

## B.  Abuse of Position of Trust – USSG § 3B1.3

Corrine Brown held one of the highest positions of public trust in American democracy.   She abused that trust in multiple ways.   The abuse of public trust includes using her status in her political office and longstanding relationships with wealthy businesspeople who had a well-known history of donating to educational causes, leveraging that knowledge and those relationships to obtain donations to One Door, and accepting fraudulently obtained money from her Chief of Staff inside the confines of her own congressional office.

USSG § 3B1.3, application note 1, defines a "public or private trust" as "a position of public or private trust characterized by professional or managerial discretion."   The position of public trust must contribute in some significant way to facilitating the commission of or concealment of the offense.   *Id.*   The analysis is not limited to the high position that the defendant held, but in the fraud context, the

guideline applies where there is a fiduciary, or other personal trust, relationship to victim of the fraud, and the defendant took advantage of the relationship to perpetrate and conceal the fraud.   *United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010).   "Thus, for the abuse-of-trust adjustment to apply in the fraud context, there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario."   *United States v. Williams*, 527 F.3d 1235, 1250-51 (11th Cir. 2008).

Corrine Brown abused her vaunted position as a Member of the United States House of Representatives when she used her status and close relationships with One Door donors to trick them (many of whom she knew historically donated large sums of money to educational causes) into donating money to a fake charity.   Brown then directed her Chief of Staff to divert that money to her.   After detailing his lengthy professional relationship with Corrine Brown and being asked about the relationship's effect on his $35,000 of donations to One Door, former CSX CEO Michael Ward testified, "Well, obviously I respect Congresswoman Brown.   And if she thought this was a good cause and she was asking me to consider and donate to it, that would heavily influence my decision to do so." Doc. 173, p. 210, lines 21-24. When asked if he trusted Corrine Brown, Ward testified, "I did."   *Id.* at p. 210, line 25 – p. 211, line 1.   Multiple other One Door donors testified similarly.   The One

Door donors gave because of who Brown was, their longstanding relationships with her, and their trust that if Corrine Brown stated the money was for a worthwhile cause, then it must be.   While serving as a Member, Brown repeatedly defrauded the One Door donors and financially benefitted.   This set of facts merits the 2-level adjustment.

### C. Obstructing or Impeding the Administration of Justice – USSG § 3C1.1

Pursuant to USSG § 3C1.1, application note 4(b), committing perjury is an example of conduct that qualifies for the 2-level obstruction enhancement if such perjury pertains to conduct that forms the basis of the offense(s) of conviction.   The obstruction enhancement is applicable when a defendant gives perjured testimony on a material matter at trial.   *United States v. Vallejo*, 297 F.3d 1154, 1168 (11th Cir. 2002).

Corrine Brown's trial testimony was replete with material falsehoods.   After taking an oath to tell the truth, Brown treated the witness stand in this Courthouse as a kind of political pulpit to say anything – no matter the degree of falsity. Throughout her testimony, Brown attempted to weave together explanations for the charged criminal conduct, explanations that were inconsistent, beyond far-fetched, outright false, and refuted by the evidence.   After a thorough review of Corrine Brown's trial testimony, it is difficult to narrow the scope of her material false testimony.   The seminal areas involved:   (1) flat denials of criminal conduct; (2)

23

material false statements concerning her knowledge of the fraud scheme, including testimony aimed at Ronnie Simmons stealing money unbeknownst to Brown; (3) the receipt of One Door checks, which resulted in cash deposited into Corrine Brown's bank account; (4) the receipt and use of Dr. Lipsky's check (Roseland Ambulatory Surgery Center) for $10,000; (5) Von Alexander's role in providing money to Corrine Brown, including accusations that Alexander was a "parrot" who was somehow coached by the government to testify in a certain manner; (6) Brown being unaware of receiving upwards of $10,000 in cash in her bank accounts in certain months; (7) further accusations that the prosecution team contrived or made up financial summary exhibits; (8) blaming innocent witnesses (including Portnoy CPA Dawn Wright) who testified truthfully under oath as to Brown's tax related conduct; and (9) Brown's claim that she paid her "fair share of taxes."

### 1.  Flat denials of criminal conduct

Brown's ardent refusals that she engaged in criminal conduct were false and material.   The jury disbelieved each of them, and convicted Brown of each type of crime charged in the Indictment.

Brown's testimony began as follows:

Q:     Did you conspire with Ronnie Simmons and Carla Wiley to commit wire fraud?

A:     No, sir.

Q:     Did you commit wire fraud?

A:    No, sir.

Q:    Did you lie on your financial disclosure forms?

A:    No, sir.

Q:    And did you knowingly submit tax returns that had false

information?

A:    No, sir.

Trial Transcript Doc. 127-1, p. 5, lines 3-12.   Brown returned to this categorical

denial at the end of her testimony when she stated, "I really believe that in life you

do the very best you can to try to help other people.   I - - the idea that I would plot,

steal, it's just not possible."   *Id.* at p. 96, line 23 – p. 97, line 1.

The evidence clearly contradicted Corrine Brown's perjured testimony.   The

jury discounted these flat denials and convicted Brown of each type of charged

crime.   The flat denials coupled with the more specific material falsehoods set forth

below require the 2-point obstruction enhancement.

## 2.  Brown's denials of knowledge and intent and blame of Simmons

In criminal conspiracy cases, a common defense goal is to discredit a testifying

co-defendant.   Brown's testimony went well beyond this accepted trial strategy.

What is not permissible is entirely conjuring false testimony and creating a new

version of the facts.   That is what Brown did as to Ronnie Simmons.

After testimony about the length of their relationship, and that Simmons was

like a son to Brown, Brown pivoted and began to blame Simmons for her criminal

predicament.   In response to a question on direct examination about when Brown

25

first knew that Simmons was stealing money, Brown testified, "[w]hen he did the plea agreement…You know, we went to the bookkeeper, we went through the accounts.   And every single thing, it was his reimbursement." *Id.* at p. 48, lines 3-9.

Brown also flatly denied that she told Simmons to deposit One Door cash into her bank account, attempting to create the belief that Simmons acted on his own.   In response to a series of questions on direct as to whether she ordered Ronnie Simmons to take money from the One Door account and put it in her bank account, Brown testified, "No, I did not." *Id.* at p. 50, lines 14-21.

Brown continued with the false narrative that the cash Simmons deposited into her accounts entirely stemmed from some reimbursement owed to Simmons. Despite the general implausibility, Brown continued to revert to this throughout her testimony, and then attempted (falsely) to blame Simmons to spare herself.   Brown reiterated her answer in this exchange on direct:

Q:       At what point did you know that the man you trusted for decades was stealing money?

A:       When he pleaded guilty.   You know, sir, that we had several meetings with Ronnie and his bookkeeper, and he constantly said that it was his money, his funds, and I believed it. …But I never, never knew that money was being taken from One Door and not used for what we advertised it for. *Id.* at p. 87, lines 2-14.

While concluding her testimony on direct, Brown continued her efforts to pin the fraud on Simmons when she testified, "I loved him.   He was my boy.   I don't

26

know how he did this, I just don't know.   I never thought he was stealing.   I didn't even say that word."   *Id.* at p. 92, lines 22-24.   Brown continued in response to another question, "I'm not going to say what I would like to say about the system, but Ronnie never should have done - - never should have taken that money."   *Id.* at p. 93, lines 4-6.

During cross-examination and immediately prior to Brown's contrived breakdown on the witness stand, when asked about Simmons depositing $3,000 in cash into her account on August 13, 2013 (money which was withdrawn from One Door in successive $800 withdrawals from August 9-13), Brown perpetuated the lie and testified: "If he gave me any money, I - - my assumption was, and he told me, it was his money.   And I know he put up his credit card.   Do you think I would do that?"   Doc. 179, p. 41, line 24 – p. 42, line 1.

Brown's testimony as to Simmons' intent and actions was materially false. The perjured testimony was part of Brown's poor attempt to concoct a story that the jury ultimately did not accept.   The evidence overwhelmingly established her testimony was materially false.

### 3.  Corrine Brown's receipt of signed One Door checks

Corrine Brown received at least four signed but otherwise blank One Door checks.   She provided instructions to Simmons and Von Alexander as to specifically how to route that money to her bank account.   Simmons also handed the "children

summer camps" One Door check to Brown, which was later made out to and deposited into Shantrel Brown's bank account.   One thousand dollars of that money was transferred into Corrine Brown's bank account.   *See* Govt. Trial Exhibit 1ZZ. During her efforts to discredit Ronnie Simmons and otherwise persuade the jury that she did not receive signed but otherwise blank One Door checks, Brown repeatedly lied.

On direct examination, the following exchange occurred:

Q:     Ronnie Simmons on the stand testified that sometimes he would give you blank checks from One Door for Education.   Did that ever happen?

A:     Never.   Never got a blank check from One Door.   Why would I?   Doc. 127-1, p. 53, lines 18-22.

Later on direct, Brown lied about this again:

Q.     Did Mr. Simmons ever give you any blank checks drawn on the One Door account?

A.     Never gave me any blank checks.

Q.     What would you have done if he said, "Here, Congresswoman, here's some blank checks, use them for what you want"?

A.     Why would he give me blank checks?

Q.     Had he given you them, what would you have said to him?

A.     He did not give me any blank check, sir.

Q.     Von Alexander on a couple of occasions said that she filled out checks based upon the direction that she got from you.   You heard her say that, right?

A.     Yes, sir.

Q.      Was that true?

A.      No, sir.   I mean, there were times - - let's be clear.   Never One Door checks.   I didn't know that Von had any One Door checks.   Why would she have them?   *Id.* at p. 67, lines 9-24.

During a lengthy exchange about the "children summer camps" check, Brown acknowledged that Shantrel Brown's writing was on the One Door check, but she repeatedly lied and claimed that she and Shantrel Brown used that money to buy "backpacks for kids" in the "garment district" of Los Angeles, California.   Doc. 179, p. 23, lines 12-24.   That never happened.

Even when repeatedly shown her own bank statement, that the money was never withdrawn as cash and used for the purpose that Brown stated, Brown was still unwilling to relinquish the lie.   She clung to the bogus "garment district" testimony. *Id.* at p. 30, lines 6-25.   When Brown was shown exactly how she spent the $1,000 from the "children summer camps" check and approximately $7,000 of additional cash she received during the approximately 30 days reflected in her bank statement, about the only somewhat truthful testimony that Brown could muster was, "Sir, I'm just like everybody else.   I know how to rob Peter to pay Paul."   *Id.* at p. 36, lines 20-21; *See generally Id.* at pp. 20-39.

The bank records corroborate the testimony of Simmons and Von Alexander. Brown was convicted on all wire fraud counts pertaining to blank One Door checks (Counts 10, 11, 12, and 13).   Brown violated her oath to testify truthfully when she

tried to weave a nonsensical explanation together as to these blank checks.   This

testimony alone should result in Brown receiving the 2-level obstruction

enhancement.

### 4.  Brown's use of the $10,000 Roseland check

Corrine Brown again perjured herself when she lied about the $10,000

Roseland Ambulatory Surgery Center check that Dr. Lipsky provided to her in New

York.   From this check, $8,000 in cash was ultimately deposited into the bank

accounts of Corrine and Shantrel Brown.   Brown was convicted of the mail fraud

(Count 7) and wire fraud (Count 15) pertaining to the shipment via FedEx and the

deposit and ensuing financial transactions involving this $10,000 check.[17]

On direct, Brown attempted to gloss over this check and claim simply that

Lipsky provided the check and that it had a connection with costs associated with the

production of the commemorative Onyx magazine featuring Brown during the 2014

election campaign.   *See generally* Doc. 127-1, pp. 68-70.   Brown would not admit

that she received $4,000 cash in her bank account, or that $4,000 cash was deposited

into Shantrel Brown's account.   *Id.*   Instead, during cross examination, Brown

claimed that she received "an envelope with checks" with "three, four, or five

checks" and that she merely "gave the checks to Ronnie Simmons."   Doc. 179, p.

---

[17] This scenario highlights that Brown was comfortable receiving blank checks while serving as a Member of Congress.

44, lines 11-15.   Brown then essentially blamed Simmons and Von Alexander for how the $10,000 check was handled, and denied that she told Alexander how to structure the deposit and movement of that money.   *Id.* at pp. 43-51.   Corrine Brown then attempted to weave together a theme that Alexander actually owed her money, which explained the deposits and cash going to Corrine Brown and Shantrel Brown from the $10,000 check:

> And my testimony is that I did not give her that information, or any information that she gave when she tried to explain that she had received money for her rent or she lost her car or she was put out of her place where she was living and she needed money even during this time period.   She didn't have money for gas.   She didn't have money for food.   She didn't have money to turn her phone on.   During this time period, she came to my mother's house and I gave her money.

*Id.* at p. 50, lines 17-24.   Corrine Brown's testimony about the $10,000 check was not only incredible, it was perjury.   Brown's winding, false explanations and refusal to admit that she should not have personally received that money in her account warrants the obstruction enhancement.

### 5.  Brown lied about Von Alexander's role in funneling money to her

Corrine Brown lied about Von Alexander's role in funneling illegal cash to Brown for years.   Brown compounded the lie when she accused the government of crafting false testimony for Alexander to repeat in court.   Brown even called Alexander a "parrot…programmed to say exactly what was told to her."   *Id.* at p. 79, lines 20-21.   During direct examination, Brown testified:

31

Q:      Did you ever direct Von Alexander to fill checks out in a certain way?

A:      Not to my knowledge did I tell her how to fill out checks in a certain way.

Q:      Did you ever tell her to do anything that you believed or knew was fraudulent or illegal?

A:      Absolutely not.

Q:      Did you ever ask her to funnel money through her accounts and then put it in your account so you could try to hide it?

A:      No, sir.

Q:      But you heard her testimony, right, to that effect?

A:      I did.

Q:      Do you know whether or not Von Alexander ever put money in your account?

A:      I do know she did.

Q:      Why would she do that?

A:      Because Von Alexander owed me money.   Doc. 127-1, p. 65, line 15 – p. 66, line 6.

Brown continued to weave a lie and explain that the thousands of dollars of illegal funds that Alexander deposited into her account (and Shantrel Brown's account) was all money that Alexander owed Corrine Brown.   *See generally Id.* at pp. 66, 81.   Brown clung to the lie even though she could not explain why One Door was regularly writing checks to The Alexander Agency, which then resulted in Brown receiving cash deposits, as opposed to Alexander simply writing Brown a check.   When presented with the specific example of government exhibit 11A (One

32

Door check number 164 in the amount of $2,086.10 payable to The Alexander Agency), which was the source of $1,650 cash deposited into Corrine Brown's bank account, Brown testified, "Repeat, Von Alexander constantly borrowed money. Von Alexander, once she got money, repaid her debt.   Von Alexander is not a family member of mine.   So when I give her money, when her clients pay, she repays me.   I understand that she explained that to somebody."   Doc. 179, p. 65, lines 1-5.   Brown's superficial justification for the money Von Alexander deposited into her accounts is belied by both the record and common sense, and provides further support for the 2-level obstruction enhancement.

### 6. Brown's awareness of thousands in unexplained cash in her bank accounts on a monthly basis

Corrine Brown refused to acknowledge that she knew about thousands of dollars in cash almost each month (sometimes in excess of $10,000 per month) being deposited into her bank account.   Brown attempted to explain the indisputable bank records during the following exchange on direct examination:

Q.   How could you not know - - if these summary charts are true, how could you not know about thousands of dollars going into your bank account?

A:   I wish I could just answer that.   I wish I paid more closer attention to my finances.   I was always busy working on things for my constituents. Doc. 127-1, p. 72, lines 17-19.

Brown perpetuated the constituent service angle with, "I'm so busy with my constituents that I'm not taking care of Corrine's personal business."   *Id.* at p. 83,

lines 6-8.

During cross-examination, Brown lied about the origin of the cash she became accustomed to receiving on a regular basis.   When covering a summary chart (Government Exhibit 49A) illustrating the amount of cash Corrine Brown received in her bank account from 2009 through 2014 (a total of $141,905), Brown testified:

Q:   Do you see the total there, $141,905?

A:   Uh-huh (affirmative).

Q:   Where did all that money come from?

A:   I think that's what you-all - - you did your analysis.   What did you find out?

Q:   Well, it came from One Door for Education, right?

A:   I don't think so.

Q:   Did it come from CRC and LaPool?   Right?

A:   I don't think so.

Q:   Did it come from the Friends of Corrine Brown?   Right?

A:   Wrong.

Q:   It came from checks that went to The Alexander Agency where she wrote checks to cash and put those in your account, right?

A:   Wrong.

Q:   And there was a lot - - tens of thousands of dollars that was unaccounted for because nobody could figure out where it came from, right?   Right?

A:   No question - - I don't have an answer for you.

Q:   You don't have an answer for where tens of thousands of dollars of cash came from that went into your account?

A:   That's correct.   I kept - - I guess - - I looked at some of the

34

information you had.   I had birthdays.   I had Christmas.   You know, and
sometimes I have boyfriends.   So, I mean, I don't know what you're talking about.
Doc. 179, p. 102, line 6 – p. 103, line 5.

The record, including evidence that Brown routinely kept an eye on her
finances through regular balance inquiries, undermines Brown's ludicrous claims
that she had no idea she was receiving tens of thousands of dollars in cash on a
monthly basis.

### 7.   Brown accused FBI and IRS Accountants of fabricating evidence

"Garbage in, garbage out" was Brown's explanation and testimony regarding
the forensic accounting of FBI Forensic Accountant Kimberly Henderson and IRS-
CI Special Agent Shawn Batsch.

Q:   So recognizing that Mr. [James] Smith didn't invent garbage
in/garbage out, are you saying that the work that Agent Batsch and Ms. Henderson
did is garbage?

A:   I am saying that - - I don't know what you want to call what they
did, but when you sit up here and say she would have overdrawn her account every
month based on assumptions, based on certain things, and then didn't have input
from me then, you know, I don't know how you do that.

Q:   Let's look at - -

A:   All I know is that you spent X amount shopping, you spent X
amount doing this, X amount doing that.   That's not me.   That's what they're
saying.   Economics, statistics is based on what you put in the system.   Now, I'm
not a computer person, but I do know one thing, if you feed garbage in, then you're

35

going to get garbage out.   *Id.* at p. 53, line 20 – p. 54, line 9.

Brown accused the agents of fabricating information or presenting incomplete financial data.   The financial summary charts were uncontroverted.   Brown chose to mount personal attacks on the agents and then failed to back up the false attacks with any credible evidence.   Brown attempted to use her wit to talk her way out of trouble - a tactic she employed frequently throughout her testimony.   That amounts to obstruction.

### 8.  Brown blamed innocent citizens for her tax crimes

Brown impugned the integrity of law abiding citizens when attempting to explain her tax troubles.   During cross-examination, Brown most willingly took aim at Portnoy CPA Dawn Wright.   When asked about Dawn Wright's testimony concerning Corrine Brown telling Wright that Brown gave $12,500 by cash or check to One Door For Education during tax year 2012 (as well as other cash donations in tax years 2013 and 2014), Brown testified, "I have no idea.   I guess - - I actually did not give this information to her."   Doc. 127-1, p. 111, lines 5-6.   Brown then pivoted and testified about the purported $12,500 donation to One Door and stated, "I don't recall telling Ms. Wright that….Sir, maybe she talked to someone else."   *Id.* at p. 111, line 25, p. 112, line 4.

Throughout the trial, Brown was willing to impugn other witnesses and state or insinuate that they lied on the stand, when the evidence showed that the

individual who perjured herself was Corrine Brown.

### 9.   "I believe in paying my fair share of taxes"

Corrine Brown provided that testimony (*Id.* at p. 76, line 22) in response to a series of questions about her claimed furniture donations to Edward Waters College. The evidence showed that though Brown procured donation letters for tax years 2008 and 2009, the furniture at issue had been at the college since the late 1990s. When considered more globally, Brown's testimony of paying her fair share of taxes is belied by her tax convictions spanning seven tax years, and the evidence illustrating that Brown conservatively cheated the IRS out of at least $62,650.99. Had Brown "paid her fair share," the jury would not have convicted her of four tax fraud felonies.

Corrine Brown's perjured testimony was false, material, and irreconcilable with the substantial body of evidence establishing her guilt.   The jury discounted Brown's rambling effort to manipulate and mislead.   Brown made statements on the stand with the willful intent to provide false testimony, not because of mistake, confusion, or faulty memory.   Brown knew exactly what she was doing.   It is one matter to craft a legal defense and put the government to its burden.   It is entirely another to do what Corrine Brown did.   The Eleventh Circuit has noted that "[w]hen a defendant chooses to testify, [s]he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true."   *United States v. Brown*, 53 F.3d

37

312, 314 (11th Cir. 1995).   That is exactly what happened here.

During a criminal trial, a defendant has a right to testify or not to testify.

However, this constitutional right does not shield a defendant from the consequences

of a willful choice to commit perjury.   If that were the case, a defendant's oath to tell

the truth would mean nothing.   Corrine Brown perjured herself on the material

matters set forth above, and thus obstructed or impeded the administration of justice

as contemplated in USSG § 3C1.1.   The Probation Officer appropriately scored the

2-level enhancement.

### III.   18 U.S.C. SECTION 3553(a) – SENTENCING STATUTE

#### A. 3553(a)(1) – nature and circumstances of the offense and history and characteristics of the defendant

The nature and circumstances of the offense are set forth in detail in section I.

The Pre-Sentence Reports (PSR) contain detailed information about each

defendant's history and personal characteristics.   A stark contrast is how each

defendant approached this case.   Wiley cooperated within a month of the

investigation becoming public in early January 2016.   Simmons began cooperating

in early 2017 and pled guilty on February 8, 2017.   Neither made significant public

comments about the charges.   Corrine Brown, however, consistently made public

comments, during which she disparaged every part of the justice system and cast

aspersions on the integrity of the government's prosecution when she consistently

exclaimed that the government's prosecution was racially and politically motivated.

As set forth, the evidence and jury's verdict clearly show otherwise.

Both before and after Corrine Brown's reprehensible invocation of the Pulse nightclub tragedy during public comments after the July 8, 2016 arraignment, Brown leveled baseless and offensive attacks against the government and the Court.   The following are additional comments that Corrine Brown made during the investigation and case that reflect a complete lack of respect for the law and for the criminal justice system, and illustrate Brown's character.

**Pre-Indictment:**

March 24, 2016 – "Well, you know, the goal is to take me out.   I realize that. That is a good example."[18]

March 25, 2016 – "I think it's an organized effort to take me out."[19]

April 29, 2016 – (when interviewed about her perception of being targeted) – "Well, it's a people out there, you know I don't want to say the boogieman, I mean who do you think?   But there are people that's targeting me.   It is clear that I am a target….   You know, what bothers me is knowing that it's an organized bully attack on me.   And everybody knows that.   It's organized, and it's bullies, and they're after me.   Clearly."[20]

---

[18] www.news4jax.com/news/politics/corrine-brown-responds-to-investigation

[19] www.firstcoastnews.com/news/politics/rep-corrine-brown-to-battle-redistricting-in-federal-court/101612571

[20] www.firstcoastnews.com/news/local/exclusive-corrine-brown/158464512

**Post-Indictment**:

July 8, 2016 – (Regarding the criminal case and the Pulse nightclub massacre) – "I represent Orlando.   These are the same agents that was not able to do a thorough investigation of [Omar Mateen] and we ended up with fifty people dead, and over forty-eight people injured.   Same district.   Same Justice Department.   Same agents.   And with that, I will see you in court."[21]

July 10, 2016 – "I'm not the first black elected official to be persecuted and, sad to say, I won't be the last."[22]

August 1, 2016 – (when asked to respond to the allegations in the Indictment) – "Half-truth and witch hunt.   Period.   …My job is to let people know what I've done.   Team attorney is to deal with that witch hunt."[23]

August 19, 2016 – (to a group of reporters after a political debate during the Democratic primary) – "Let me ask you folks a question:   What if I accused you guys of being pedophiles?   I bet that didn't feel too good, did it?   Well that's how I feel, especially because I'm innocent.   Despite this, you guys come at me like a lynch mob demanding that I prove my innocence in a 20-second sound bite.   Maybe

---

[21] Corrine Brown made these statements on the Courthouse steps the day of her arraignment on the Indictment.   FBI SA Angela Hill serves on the FBI Evidence Response Team.   Agent Hill witnessed firsthand the aftermath of the Pulse nightclub shooting.

[22] Corrineb2016.blogspot.com/2016/07/note-to-my-friends

[23] www.youtube.com/watch?v=N-PcR_oL-mU

you were goofing off in your middle-school civics class but in the United States of America accused people are innocent unless proven otherwise.   An indictment is an accusation.   It is not a conviction.   You worship the Constitution's First Amendment so maybe you never got to the Fifth Amendment that says it's the prosecution's job to prove guilt."[24]

September 14, 2016 – "Sadly the Department of Justice has smeared my good name, and in the process has significantly hindered my ability to raise campaign funds."[25]

September 22, 2016 – "This US Attorney has damaged my name.   And the fact is I have my attorney here to discuss these bogus, racist charges that was done prior to the August 30 election.   And he indicated that Corrine Brown will not win her election.   …And I've done some research, and it is amazing to me how they target African American Congresspeople."[26]

March 1, 2017 – (Answering a question about why the Justice Department would target Corrine Brown) – "I guess I'm a black woman with a mouth."[27]

March 27, 2017 – (Interview with News4jax.com) (Disparaging Ronnie

---

[24] Corrineb2016.blogspot.com/2016/08/note-to-florida-press-corps

[25] Corrineb2016.blogspot.com/2016/09/

[26] Newsone.com/3544890/florida-rep-corrine-brown-denies-spending-800000-in-charity-money-for-personal-use/

[27] www.wesh.com/article/former-rep-corrine-brown-speaks-to-wesh-2-news-about-upcoming-court-case/9082493

Simmons and his attorney Anthony Suarez after Simmons pled guilty) – "That, that hurts.   It really does.   Someone that you groom and love as a son.   Maybe I just didn't give him enough backbone.   Or, you know, he had a sorry attorney."

"I'm not scared at all.   I'm not scared, I want twelve people to say she is not guilty, and we gonna expose this criminal justice system."

(Answering a question about opposing the federal government) – "Oh yeah.   I am.   I am.   I've been listening to the news, and it seems as if that's what the prosecutors do.   They go after people and they make them plea out.   They say well you take three years or we gonna give you thirty.   Well, in my case, three hundred and fifty years."[28]

April 5, 2017 - Prior to a pre-trial status conference, Corrine Brown served ice cream from a truck positioned in Hemming Plaza in downtown Jacksonville across from the federal courthouse.   Brown (aided by supporters) also distributed an editorial from the Florida Star Newspaper dated April 1, 2017 that Brown endorsed. The editorial titled "Corrine is the Latest Victim of a Racist System Targeting Black Officials,"[29]  contained the following:

"Racism and possible sexism is built into the political system as it relates to

_____

[28] www.news4jax.com/video/i-team-corrine-brown-wont-accept-plea

www.news4jax.com/video/i-team-corrine-brown-defends-herself

[29] The Florida Star Newspaper, April 1, 2017, Page 10 Vol. 66 No. 50

who gets targeted for investigations and how those investigations are carried out. The FBI, CIA as well as the state political and criminal justice apparatuses are all documented as being a part of a system that has a strong appetite for black political flesh.   Former Congresswoman Corrine Brown is one of the latest examples of this reality."

The end of the article implored readers to pay Brown's legal fees to her trial attorney.   Brown was quoted as saying, "No amount is too small."

April 13, 2017 – (Accusing FBI of threatening people) – "Elderly people in my district.   They're going to their homes and said, 'If you don't talk – make it easy on yourself.'"[30]

## Post-Conviction:

May 16, 2017 – "Well, I think it's been some tampering with the jury.   When we looked at the one person that was throw off, he was a retired veteran, disabled.   I have real concerns with how it happened and of course I'm gonna let my attorney handle that.   But I understand it's been a lot of – if this is what goes on in the jury room, it's unbelievable some of the things that's come out."

"I know the work that I've done.   So basically I do have – I have found out more about the criminal justice system than I wanted to know.   And it's for a

---

[30] www.actionnewsjax.com/news/local/former-rep-corrine-brown-hands-out-ice-cream-before-court-hearing/509418563

reason.   I'm going through this for a reason.   People are coming to me, telling me about what's wrong with the system.   And I'm finding out what's wrong."

(Reaction to public comments of a juror) – "I am very upset, and I really think that if the judge had hear this information during the trial, he would have brought the jury in and would have changed maybe some of the dynamics.   It is very concerning to me that they leave the other jurors to think that that person, juror number 13, was being sent to jail and that it could happen to you if you don't vote right.   That is a very serious indictment on the criminal justice system, and this is just unbelievable that that could happen.   The bullying, the harassment, that may be some dynamic, but to imply that you could go to jail if you don't vote a certain way is unheard of."[31]

May 19, 2017 – "I am having some real serious concerns about not just the criminal justice system … but even the jury."[32]

These public comments speak for themselves.   Corrine Brown heaved rhetoric and undue criticism at every facet of the criminal justice system, both prior to and after the fair trial that she received.   These comments were not isolated.   They were ongoing during every phase of the investigation and case, and routinely involved false allegations of racism and political motivation.   This is not someone who

---

[31] www.news4jax.com/news/investigations/corrine-brown/corrine-brown-talks-about-conviction-future-with-tom-wills

[32] www.jacksonville.com/news/metro/2017-05-18/free-now-corrine-brown-back-her-element

deserves leniency.   Rather than decline comment, show remorse, or simply assert her innocence, Brown employed tactics that revealed her character, moral fiber, and viewpoint of the American system of justice.   The rhetoric is damaging to the integrity of our public institutions, and undermines the public's faith in government.

## B.  3553(a)(2) – the need for the sentence imposed

The Court must fashion a sentence that reflects the seriousness of the offenses, promotes respect for law, provides just punishment for the offenses, and affords general and specific deterrence.   The seriousness of corruption and fraud committed by elected officials (and those involved with them) is hard to understate.   The aggravating factors in this case are the length of the scheme to defraud and Brown's tax fraud, the illustration through the evidence that Corrine Brown's mindset was to avail herself of a consistent flow of cash for many years, and that Brown found ways to skirt limits on donations to Friends of Corrine Brown and the Florida Delivers PAC.   By steering donors to One Door, Brown was not constrained to ask for a certain donation dollar amount.   Brown and Simmons lied to donors about what One Door was, what it was doing, and how their donation money was used.   Wiley availed herself of the spoils of the fraud and stole a significant sum.

As the government indicated during opening statement and closing arguments, Brown knew that One Door was the perfect (false) charity.   Brown knew that numerous Jacksonville and Orlando based donors had a long history of donating

significant sums of money to educate the less fortunate.   Brown seized on that knowledge and enriched herself.   Prior to the One Door scheme, Brown became accustomed to receiving thousands of dollars in illegal cash.   When One Door was presented to Brown, it became yet another mechanism for that to occur.

Simmons profited from the bogus employment of his sister (Monica Isom) for many years.   Simmons pled guilty to aiding and abetting the theft of government property (Count 18).   Simmons admitted that from at least July 2011 to January 2016, he assisted in the ghost employment of his sister with Corrine Brown's congressional office and availed himself to tens of thousands of taxpayer dollars that he never should have received.   Simmons, who already received a significant salary with taxpayer money, determined that he did not make enough to cover his lifestyle and concocted the ghost employment to benefit himself.   The taxpayers deserve far better from a Congressional Chief of Staff.

The public deserves honesty and transparency in its elected officials and public servants.   The goal of honesty and transparency is the reason behind the requirement for Congressional Members and their Chiefs of Staff to file annual financial disclosure forms.   Brown lied on those forms for years, a crime for which the jury convicted her.

Brown (as she did in trial) will undoubtedly point to her twenty-four years of service in the United States House of Representatives, and many would say that she

(and Simmons) performed their duties and provided admirable service to constituents.   While the Court may consider that viewpoint, no amount of good work can overshadow the fact that Brown used the very same goodwill she generated over the years as the means to commit crimes, and then made efforts to hide her crimes from the electorate and taxpayers.   Brown's public office was critical to her crimes; without it, she could not have raised the amount of money she raised with so few questions.   Her office enabled these crimes, and all of the good things she'll claim she did only helped her pull it off more easily.   This highlights why general deterrence is critical in this case.   The court must fashion a sentence that informs public officials that when they use their political offices to perpetrate crimes, they will receive significant punishment.

## C. 3553(a)(6) – unwarranted sentencing disparities

This is perhaps the most difficult sentencing factor to analyze, and, from the Court's perspective, to implement.   Despite general similarities among types of crimes, the United States recognizes that no two public corruption/fraud cases are precisely the same, and that these types of cases are truly unique.   In endeavoring to determine the types of sentences imposed in public corruption/fraud cases throughout the country (including within the Middle District of Florida) over the past approximately sixteen years, undersigned counsel analyzed several cases involving Members of Congress and other types of corruption/fraud cases involving

elected or appointed positions.

It is clear that differences exist in the types of sentences imposed.   The sentences range from 166 months of imprisonment for William Jefferson (former House Member from Louisiana) and 120 months of imprisonment for Chaka Fattah (former House Member from Pennsylvania), to 37 months for Rick Renzi (former House Member from Arizona), and 30 months for Jesse Jackson, Jr. (former House Member from Illinois).[33]   However, one takeaway is clear.   No Court sentenced any of these defendants to a probationary sentence.

### D. 3553(a)(7) – Restitution

The government performed a detailed analysis of an appropriate restitution figure in this case.   The government considered trial testimony and witness interviews, in which donors testified (or stated) that they gave to One Door based on representations that the donations would be used for a charitable purpose (scholarships and educational opportunities for disadvantaged students).   The government took a conservative approach and eliminated all donations for the China trip in the summer of 2015, even though the donations for the China trip were approximately $30,000 in excess of the cost of the trip, and Corrine Brown continued to receive cash in her bank account as donors made donations for the China trip.

---

[33] Attached as Exhibit 2 is a chart outlining past cases over the prior 16 years involving Members of the United States House of Representatives.   The chart also includes information about the case of Tony Nelson (case no. 3:10-cr-23-J-32TEM), which this Court tried.   The undersigned includes this chart as an aid to provide this Court information about certain public corruption/fraud cases throughout the country.

The government's restitution figure provided to the Probation Office is $452,515.87.

The government's submission to the Probation Office itemized each donor and the

restitution amount each should receive.

### IV.   CONCLUSION

This is a significant case.   The Court must fashion a sentence for each

defendant that renders justice.   The United States will recommend a specific

sentence for each defendant at the sentencing hearings.

> Respectfully submitted,
>
> W. STEPHEN MULDROW
> Acting United States Attorney
>
> */s/ A. Tysen Duva*
> A. Tysen Duva
> Assistant United States Attorney
> Florida Bar No. 0603511
> Michael J. Coolican
> Assistant United States Attorney
> USA No. 156
> 300 N. Hogan Street, Suite 700
> Jacksonville, Florida 32202
> Telephone:   (904) 301-6300
> Facsimile:    (904) 301-6310
> Tysen.Duva@usdoj.gov
> Michael.Coolican@usdoj.gov

ANNALOU TIROL
Acting Chief

/s/ *Eric G. Olshan*
Eric G. Olshan
Public Integrity Section
Criminal Division
United States Department of Justice
1400 New York Ave. NW, Suite 12100
Washington, D.C. 20005
(202) 514-1412
(202) 514-3003 (fax)
Eric.Olshan@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2017, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system, which will send a notice

of electronic filing to the following:

James Wesley Smith, III (Counsel for Corrine Brown)

Samuel A. Walker (Counsel for Corrine Brown)

Anthony Suarez (Counsel for Elias Simmons)

Justin E. Fairfax (Counsel for Carla Wiley)

/s/ *A. Tysen Duva*
A. Tysen Duva
Assistant United States Attorney