## Comprehensive Sentencing Mitigation Report

Corrine Brown

### Introduction

According to the provisions of 18 U.S.C. § 3553, the court shall impose a sentence that is sufficient, but not greater than necessary, to comply with statutory purposes of sentencing, and in determining such sentence, the court shall consider, inter alia, (1) the nature and circumstances of the offense, and the history and characteristics of Ms. Brown, and (2) the need for the sentence imposed, as set forth in § 3553(a)(2). In consideration of the sentence that must be imposed in this case, Corrine Brown respectfully requests that the Court consider the following information in mitigation of her sentence:

### Current Posture of Ms. Brown

*Ms. Brown's Response to Her Status*. On May 11, 2017, Corrine Brown was found guilty of 18 counts of a 24-count Indictment following a jury trial. She was subsequently adjudged guilty of those offenses. According to the presentence report (PSR p.2), on July 8, 2016, Ms. Brown self-surrendered to the United States Marshal's Service, and released on $50,000 unsecured bond, without pretrial supervision. Ms. Brown has complied with all of the terms and conditions of her release. As of the date of sentencing, Ms. Brown will have successfully completed approximately 16 months on pretrial release, without incident. Despite the jury's verdict, Ms. Brown remains respectful of the role of the courts in the administration of justice.[1]

*Collateral Consequences of the Offense.* Prior to her conviction on the instant charges, Ms. Brown was a long-term member of the United States House of Representatives. In 2016, following the announcement of the Indictment against her, Ms. Brown was forced to abandon her newly acquired

---

[1] Brown, Corrine. Personal interview. 26 October 2017.

position as the Ranking Member of the House Committee on Veterans Affairs, an appointment for which she had worked diligently for the entirety of her service in Congress.  In the election of 2016, Ms. Brown was defeated in her bid for reelection for her seat in District 5, due in no small part, to the negative pretrial publicity emanating from her Indictment.  Ms. Brown's loss in the Democratic Primary Election was also related to her status as a candidate in a newly redistricted District 5.  Once redrawn, the district had more than 62 percent new voters.[2]

Despite that reversal of fortune, Ms. Brown garnered 32,157 votes, losing by a margin of just over 7,000 votes.  Given her status as a convicted person, Ms. Brown, a former sitting congresswoman, has lost previously enjoyed civil rights, such as the ability to hold any other future political office, and the privilege of voting in the future.  She has also incurred immeasurable shame and public ridicule – much of it unduly vitriolic -- following more than 34 years of dedicated public service to both the State of Florida and the nation.

### Factors in Mitigation of the Offense

There are several factors in mitigation of the offense that may be pertinent to the provisions of USSG §1B1.4 (Information to Be Used in Imposing Sentence; Selecting a Point within the Guideline Range or Departing from the Guidelines).[3]  Although these considerations do not challenge the propriety of the jury's verdict, they are relevant to the nature and circumstances of the offense.

First, Ms. Brown was not involved in the creation of the One Door for Education organization.  Its brainchild was Carla Wiley, who created the organization in honor of her then living mother, who is now deceased.  Ms. Brown also had no involvement in the creation and management of the organization's

---

[2] Daily Kos Elections congressional districts redistribution analysis (post-2010 census).

[3] A court is not precluded from considering any information that the guidelines do not take into account in determining a sentence within the guideline range, or from considering that information in determining whether, and to what extent, to depart from the guidelines. USSG §1B1.4, comment. (backg'd.).

website, which was exclusively under the domain of Carla Wiley and Ronnie Simmons.  Consequently, although she has been convicted of illegally receiving some of the donated funds, there is a strong inference that the idea for scheme was hatched prior to her involvement, and that there may have been some opportunism contemplated by others through their association with the high-level persona of Ms. Brown, who was then serving in the United States Congress.

Second, although the loss amount is still under objection at the time of this report, the reported loss figure is close to the low end of the threshold amount of more than $550,000, but not more than $1,500,000, to qualify for a 14-level increase.  Since the concept of loss, along with other relevant factors under the guidelines, serves as a measure of the seriousness of the offense, and the defendant's relative culpability, it is the principal factor in determining the offense level under the guidelines.[4]  The guideline (§2B1.1) giving rise to the increase involved jointly undertaken activity with others, who independently expropriated money from the charity accounts for their personal use.  One example is Carla Wiley, who acting severally, took at least $156,600 from One Door.

Third, although the guideline loss amount cannot be adjusted by the recognition of documented expenditures to benefit youth, Ms. Brown helped with the provision of more than 1,000 computers that were delivered to disadvantaged students, and arranged for almost two dozen students to take an educational trip to China.[5]  Because of Ms. Brown's efforts as a backer of the computers and the trip, it appears likely that the students derived significant and reverberative educational benefits from their access to both.

---

[4] USSG §2B1.1, comment. (backg'd.)

[5] Appendix exhibit A.

## Ms. Brown's History and Characteristics

The following information regarding Ms. Brown's history and characteristics is offered as a supplement to the very thorough presentence investigation and report conducted by the United States Probation Office:

Ms. Brown's life has been characterized by humble beginnings, hard work, love of community, and service to others. This theme has been consistent and integral from her birth, through her service in the Congress of the United States. Born on Veterans Day in 1946, her arrival into the world pointed auspiciously toward a future love for the welfare of veterans in the service of their country. As a child of the segregated south, Ms. Brown began anticipating her own future work ethic, by observing her mother, Delia Covington, who worked during the day, and attended cosmetology school at night. Ms. Brown spent much time with her grandmother as her mother worked to secure a better future for the family. In an interview with Ms. Covington, she offered this description of her daughter: "She is an excellent caregiver and a wonderful child."[6]

Following the divorce of her parents when Ms. Brown was age five, her family consisted of the loving relationships of her mother and grandmother. As her mother worked, her grandmother provided much of the caregiving, while Ms. Brown's grandfather provided financial reinforcement for the family. In those days, as Ms. Brown described it "the community took care of its own." With a supportive foundation, Ms. Brown focused on her education, with aspirations for the world of college and beyond. Intertwined in Ms. Brown's life during those years was her uncle and brother, both of whom had military backgrounds. With the excellent character of these men imprinted on her mind, Ms. Brown began cultivating a love of military service.

---

[6] Covington, Delia. Personal interview. 6 November 2017. Appendix exhibit B.

4

Despite the positive internal family circumstances, externally, society was still lagging in its equal treatment of all races.  Like many African Americans of that era, Ms. Brown was challenged with the unfortunate scourge of segregation regarding public accommodations and services.  A prominent example occurred on a Sunday after church services, when the family stopped to buy ice cream from a vendor at 44th and Main Streets near downtown Jacksonville.  As was customary during those times, the family received the response, "We don't serve […]."  Undaunted by this indignity, and relying on the foundation instilled by her family values, Ms. Brown did not rail against society.  Instead, she surrendered herself to the sound advice and guidance from notable mentors accessible to her, such as Mary Singleton, Sallye B. Mathis, Dr. Arnett Girardeau, Gwendolyn Sawyer Cherry, Clanzel T. Brown, and others.

Following her graduation from New Stanton High School, Ms. Brown began her studies at the Florida Agricultural and Mechanical University (FAMU) in Tallahassee, Florida.  It was about this time that another impressive military veteran entered her life.  Mr. William Covington had met and married her mother.  He served proudly in the United States Navy, and worked on base as a civil servant, following his retirement.  As a stepfather, the late Mr. Covington left an indelible impression on Ms. Brown.  He was an excellent husband, father, and provider for the family.

In 1969, Ms. Brown graduated from FAMU with her undergraduate degree, and continued her studies there by earning a master's degree in 1971.  After completing graduate school, Ms. Brown returned to Jacksonville to begin a career in education.  Her first assignment was at Northwestern Junior-Senior High School.  With the specter of segregation still looming over the community, this assignment would be her first exposure to students of Caucasian descent.  The following year, she was transferred to J.E.B. Stuart Junior High School.  It was during her experience at this school that Ms. Brown decided to enter to the University of Florida (UF) to obtain an education specialist certificate, which she received in 1975.

Ms. Brown's early professional experiences includes work as a counselor at the University of Florida of University. In that capacity, she counseled freshman and sophomore students.  Ms. Brown served as an assistant to the President of Edward Waters College (EWC), Jacksonville, Florida.  In that role, Ms. Brown was the catalyst for the institution's first accreditation. Ms. Brown also worked as the outreach coordinator at the Florida Junior College, Jacksonville, Florida.  Her responsibilities there involved organizing programs and events promoting the programs and success of the college.  While there, she organized the first women's conference conducted at the school.

Following her early career in the educational field, Ms. Brown's began her legislative career in the Florida House of Representatives, where, as has been related earlier, Ms. Brown launched herself into a lifetime of service to others.  Ms. Brown has been widely recognized for her humanitarian contributions by the award of the following distinctions: Honorary Doctorate from Bethune-Cookman College; Honorary Doctorate of Law from EWC; Honorary Doctorate in Humane Letters from Richmond Virginia Seminary; and the Humanitarian Karic Brothers Award (2011).[7]

## Community Support

Ms. Brown has the unwavering support of her family, in addition to a wide swath of other members of the community.  Several community members were interviewed for this report.  They suggest that Ms. Brown has been a tremendously valuable member of their community, both in and out of Congress.  While not excusing Ms. Brown's conduct that is the subject of the conviction, or opining on the sanctity of the jury's verdict, there is a consensus among the respondents that Ms. Brown's conduct within Jacksonville, Florida, and related communities, has been associated with positive efforts, and community building.

---

[7] Appendix exhibit C.

6

Additionally, a volume of persons in the general community who are knowledgeable of Ms. Brown's character have written letters of support on her behalf.  They have been submitted under separate cover for the court's further consideration.  The collective theme of their sentiments is that Ms. Brown is a compassionate person.  They have used terms such as "dedicated, eager to help others, and patriotic," to describe her.  None of the letter writers indicate that they have seen anything in Ms. Brown's background that presents an ongoing threat to any segment of the community.

### Employment-Related Contributions

Ms. Brown's life's calling has been as a lawmaker and public servant in the State of Florida and the United States of America.  As a public official, her emphasis has been legislative initiatives geared toward the improvement of all people, and has been highlighted by her work on behalf of veterans of the United States Military.  As a freshman member of Congress in 1993, Ms. Brown showed an early interest in transportation funding issues when she led a fight to increase the appropriations formula for projects affecting her district.  In its former iteration, the formula disadvantaged larger states such as Florida, Texas, California, and New York, commonly regarded as "donor" states.  The legislative initiative led by Ms. Brown brought equity to the funding of projects in her district, as well as the State of Florida.  This initiative was crucial to the continued economic development within Florida and the nation.

As a senior Ranking Member on the House Committee on Transportation and Infrastructure, Ms. Brown was instrumental in securing funding for the improvement of bridges and roadways to improve the traffic conditions in Northeast Florida.  She chaired the subcommittee on Railroads, Pipelines, and Hazardous Materials, which plays a substantial role in the economy of the State of Florida.[8]  Additionally,

---

[8] Appendix exhibit D.

Ms. Brown was instrumental in the passage of a number of other major legislative initiatives benefitting Florida and the nation.[9]

Ms. Brown's unyielding devotion to the welfare of the men and women who have served the country in the military has been the hallmark of her career in the United States Congress.  Ms. Brown was fully committed to the development of legislation and programs that not only directly benefitted recent veterans, but also memorialized the exploits of veterans whose contributions have been obscured by the cloud of history.  Although Ms. Brown's efforts on behalf of veterans were nearly inexhaustible, they can be highlighted by the following passages.

With respect to her work on the House Committee on Veterans Affairs, Ms. Brown spearheaded several committees, projects, and programs to ensure that the country's veterans are properly respected for their service of the country.  She served on the committee for her entire 24 years in Congress.  In that position, Ms. Brown contributed to the furtherance of veterans' causes by advocating for a number of initiatives, such as improved benefits, healthcare, and services for all veterans.

Ms. Brown was instrumental in the development of programs addressing veteran homelessness, and the plight of disabled veterans.  As the Ranking Member, Ms. Brown sponsored legislation leading to the passage of the Homeless Veterans with Children Reintegrating Act.  The law directed the Secretary of Labor to prioritize homeless veterans with dependent children for the receipt of services through the Homeless Veterans Reintegration Program. The program provides grants to local workforce boards, nonprofits, and community and faith-based organizations to help homeless veterans find employment.[10] For her work, Ms. Brown was awarded the Legislative Leadership Award by the National Coalition of Homeless Veterans.

---

[9] *Ibid*.

[10] Appendix exhibit E.

Similarly, Ms. Brown's work with disabled veterans has inured to the benefit of those challenged by service-related disabilities.  In February 2015, Ms. Brown liaised with the Secretary of the U.S. Department of Veterans Affairs to ensure that the agency was compliant with the laws requiring accessibility for disabled veterans, particularly those with visual impairments.  Ms. Brown has also advocated for services to benefit the caregivers of disabled veterans by supporting the enactment of the Caregivers and Veterans Omnibus Health Services Act.  In June 2016, the Blind American Veterans Foundation awarded Ms. Brown the George "Buck" Gillespie Award for her work in IT accessibility for visually impaired veterans.[11] Ms. Brown was also heavily influential in addressing the needs of women veterans,[12] and veteran suicide.[13]  With specific regard to the issue of women veterans, when the Women in Military Service for America (WIMSA) Memorial in Washington, DC, was struggling with recognition and funding, Ms. Brown was instrumental in helping to secure $3 million to keep the Memorial operational.

Additionally, Ms. Brown fought tirelessly on behalf of the Montford Point Marines, who, in 1942, as African Americans, traversed the stream of racial segregation to gain admittance into the United States Marine Corps.  Although in 1942, during World War II, President Roosevelt issued a presidential directive authorizing the recruitment of African Americans into the Marine Corps, they were diverted from the traditional boot camps at Parris Island, South Carolina, and San Diego, California, to a facility at Camp Lejeune, North Carolina.  In July 1948, President Truman issued an Executive Order ending segregation in the armed services. Despite their seminal service as African American marines, the Montford Point Marines were never appropriately recognized for their service to the country.

---

[11] *Ibid*.

[12] Appendix exhibit F.

[13] Appendix exhibit G.

Ms. Brown, in her role as a staunch supporter of all veterans, was the lead sponsor for the recognition of the first African American marines enlisted at the Montford Point Training Station. Because of her efforts, a Gold Medal resolution was passed by Congress.  At a ceremony in Congress, a remnant of 368 of the surviving members were honored with the Congressional Gold Medal, the nation's highest civilian honor.[14]

Ms. Brown also took a leadership position in a host of other legislative and public policy initiatives leading to the improvement of government resources and infrastructure benefiting citizens throughout the country.  Her efforts include the securing of funding for the new courthouse in Los Angeles, California, as well as working on initiatives to force state governments to properly fund the upkeep and operation of Department of Veterans Affairs' buildings within their respective jurisdictions. Ms. Brown was also active in environmental initiatives such as the cleanup of a number of the nation's rivers.

Finally, while in Congress, in association with the Congressional Black Caucus (CBC) Foundation Scholarship program, Ms. Brown sponsored 60 interns for students interested in government and public affairs.[15]  Ms. Brown's work gave her the opportunity to mentor the young students for future service to the nation.  Ms. Brown was the top sponsor for scholarship recipients among her peers in the CBC.

---

[14] Appendix exhibit H.

[15] Appendix exhibit I.

**Record of Prior Good Works**

Ms. Brown has demonstrated a record of sincere, dedicated, and honest service to individuals, nonprofit agencies and organizations, and to the community.  Her long history of compassion began well before the circumstances of the instant offense, and is well-known and appreciated by the community.  She has done so without fanfare or expectation of recompense.  Ms. Brown's motivation for giving has been based solely on her affinity for helping people in need.

Ms. Brown has long demonstrated the compassion to help others less fortunate, or otherwise disaffected by the circumstances of life.  She has done so historically, consistently, and compassionately.  First, for 23 years while serving in Congress, Ms. Brown conducted job fairs in her District and the state, to help job-seekers obtain employment.  The fairs Jacksonville served 10,000 persons annually.  The fairs were multifaceted programs including free workshops on college resources, job training, professional career development, and entrepreneurship, among other topics.  Ms. Brown elicited the support of state and local agencies such as the U.S. Small Business Administration, and the Florida Department of Highway Safety and Motor Vehicles.[16]

Similarly, in response to the recent wave of foreclosures associated with the housing market crash, Ms. Brown helped organize and participate in foreclosure avoidance housing workshops and individual counseling services.  The workshops were in conjunction with the work of the Neighborhood Assistance Corporation of America (NACA), which is a national organization with 47 offices, headquartered in Boston, Massachusetts.  NACA's founder and CEO, Bruce Marks, was interviewed for this report.  Mr. Marks explained his organization's partnership with Ms. Brown, and her efforts to help families facing imminent foreclosure:

---

[16] Appendix exhibit J.

My association with Congresswoman Brown began when we met with state attorneys general to see how to help distressed homeowners stay in their homes. We conducted 144 foreclosure avoidance workshops, not only in Ms. Brown's congressional district, but over the entire country. I recall her efforts very specifically.  She came early and stayed late, as homeowners met with mortgage lenders attempting to save their homes.  Through her efforts, Ms. Brown literally saved lives, in addition to salvaging the homes of the participants. There were many cases when Ms. Brown would follow the homeowners to the exit after the mediation session with the lender was complete to find out if the homeowner would truly be able to pay the agreed upon terms to save their homes.   When she learned that many of the homeowners could not afford the revised terms, Ms. Brown would return the homeowner to the lender to insist that the lender agree to a more realistic figure for the homeowner. In doing so, Ms. Brown was able to help save those homeowners from $1,000 to $2,000 in monthly payment, thereby preventing those homes from foreclosing.  Of all 435 members of Congress, Ms. Brown was the most involved and effective in preserving the homes of homeowners.  She stood alone in that respect.  There was no one else who did what she did.  Ms. Brown was "all action" in helping people remain in their homes.[17]

Through their efforts, Ms. Brown and NACA helped over 250,000 homeowners throughout the country reduce their mortgages to save their homes from foreclosure.[18]

For many years during her service in Congress, Ms. Brown created programs to benefit the youth in her district. One such example was the Corrine Brown Book Club, a program in association with the Duval County School Board and other community partners, to encourage young people to increase their readership. The program offered incentives to the students by challenging them to set goals to read at least 25 books for the school year.  The theme of the club was "Help a Child to Read, Help a Community to Grow."[19]

Last, while in Congress, Ms. Brown intervened in the case of Sandra Chase, an American citizen, who, while on an innocent vacation in Ecuador in 1995, wound up being wrongly imprisoned for drug

---

[17] Marks, Bruce. Personal interview. 6 November 2017.

[18] Appendix exhibit K.

[19] Appendix exhibit L.

trafficking.[20]  During her imprisonment, Ms. Chase was treated abusively, and forced to subsist on a diet of chicken heads, exacerbating her existing health problems.   With assistance from then Congresswoman Brown, Ms. Chase's daughter, Tammi, fought to free her mother from an Ecuadorean prison.  The event gained considerable attention, and was subsequently made into a Lifetime movie.[21]

### Factors Militating in Favor of Downward Departure

According to USSG §2B1.1, comment. (n. (20(C)) <u>Downward Departure Consideration</u>, "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."  In this case, there is available information to suggest that the application of §2B1.1, may overstate the seriousness of the offense in a manner not contemplated by the United States Sentencing Commission.  As reflected in the presentence report, Ms. Brown's base offense level is increased by 14 levels for loss involving more than $550,000 but not more than $1,500,000.  The loss amount attributed to Ms. Brown under the provisions of relevant conduct is $568,081.27.

A perusal of the presentence report reflects that the personal benefit to Ms. Brown was a scant fraction of the total loss amount, which is based on the acts and omissions of others, based on relevant conduct.  Furthermore, the presentence report does not account for any acts by Ms. Brown benefiting youth for educational purposes, such as helping with the provision of more than 1,000 computers, and the coordination of educational trips for students.  This factor may be relevant to a consideration of a downward departure, based on the prospect of the offense level substantially overstating the seriousness of the offense.

---

[20] Appendix exhibit M.

[21] Appendix exhibit N.

In addition to the provisions of USSG §2B1.1, the guideline at §5K2.0(a)(4) states that [a]n offender characteristic, or other circumstance, identified in Chapter Five, Part H (Offender Characteristics), or elsewhere in the guidelines, as not ordinarily relevant in determining whether a departure is warranted, may be relevant to this determination, only if such offender characteristic or other circumstance is present to an exceptional degree.  There is a combination of two or more offender characteristics, or other circumstances, that distinguish this case from the typical cases contemplated by the Sentencing Commission, that may suggest a downward departure from the advisory guideline sentencing range.  USSG §5K2.0(c).

First, as specified at USSG §5H1.6.  <u>Family Ties and Responsibilities</u> (Policy Statement), a downward departure may be warranted in cases based on criteria, such as loss of caretaking or financial support, where the loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.  In this case, Ms. Brown's mother is age 89, and suffers from dementia.  Historically, Ms. Brown has coordinated medical and custodial care for her mother, and has an indispensable role in her mother's continuing care and treatment as she continues to age.  The loss of caretaking and support for Ms. Brown's mother would cause irreparable harm to her long-term prospects that would substantially exceed the harm incident to imprisonment.

In addition to her mother' condition, on October 20, 2017, Ms. Brown's daughter, Shantrel Brown, underwent surgery for a total thyroidectomy.[22] During the period leading to the procedure, Ms. Brown was subjected to the uncertainty of her daughter's prognosis.  Ms. Brown traveled to Virginia and spent approximately one week with her daughter to support her regarding the procedure.  Shantrel Brown is in need of a hysterectomy, a surgery originally scheduled for November 1, 2017, but was

---

[22] Appendix exhibit O.

postponed so that she could support Ms. Brown through the sentencing process.[23]  Shantrel Brown, who is unmarried, and lives alone, is facing a substantial recovery period, and will need support following the future surgery. [24]

Second, consistent with §5H1.3. <u>Mental and Emotional Conditions</u> (Policy Statement), Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree, and distinguish the case from the typical cases covered by the guidelines.

In this case, Ms. Brown's mental and emotional condition has been compromised by diagnostic information that strongly suggests that her condition, in combination with other offender characteristics, particularly her physical condition, and her family ties and responsibilities, is present to a degree that may distinguish this case from the typical case covered by the guidelines.  A more complete account of Ms. Brown's mental and emotional condition has been submitted under separate cover by defense counsel for the court's consideration at sentencing.

Third, in accordance with USSG §5H1.4. <u>Physical Condition</u> (Policy Statement), physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree, and distinguishes the case from the typical cases covered by the guidelines.  An extraordinary physical impairment may be a reason to depart downward; <u>e.g.,</u> in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

---

[23] Brown, Shantrel. Personal interview. 9 November 2017.

[24] Appendix exhibit P.

In Ms. Brown's case, her physical condition, although not seriously infirm, is impaired to the extent that she has several significant medical problems, some of which are described in the presentence report.  At age 71, Ms. Brown's medical records reflect that she has at least 14 confirmed diagnoses, and there are special concerns regarding recent problems of memory loss (family history of dementia), the possibility of glaucoma, and untreated sleep apnea.  A more complete account of Ms. Brown's physical condition has been submitted under separate cover by defense counsel for the court's consideration at sentencing.

Fourth, according to USSG §5H1.11 <u>Military, *Civic, Charitable*, or *Public Service*; *Employment-Related Contributions*; *Record of Prior Good Works*</u> (Policy Statement), although a downward departure for civic, charitable, or public service, employment-related contributions, and similar prior good works are not ordinarily relevant in determining whether a departure is warranted, in this case, a departure may be warranted because Ms. Brown's record of civic, charitable, and good works are present to an exceptional degree.  Ms. Brown has amassed a voluminous history of community-based contributions and good works, ranging from her philanthropic efforts directed at veterans organizations, to numerous charities and community service agencies, youth service organizations, and civic and business leadership organizations.  A partial catalog of Ms. Brown's history of community involvement has been itemized above in the sections entitled "History of Prior Good Works" and "Employment-Related Contributions."

Last, in accordance with USSG §5K2.0(a)(2)(B). <u>Unidentified Circumstances</u>, a departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines, but that nevertheless is relevant to determining the appropriate sentence. In early September 2017, during the pendency of this case, Hurricane Irma made landfall in the State of Florida, causing catastrophic flooding and damage throughout the Caribbean, Florida, and a number of other states.

In Jacksonville, flooding surpassed the record set by Hurricane Dora (1964).  During the storm, Ms. Brown's residence, which serves as her homestead, sustained extensive damage, rendering it uninhabitable until it is rehabilitated and cleared for re-occupancy.[25]  Consequently, Ms. Brown remains dislocated while she is continuing the process of mitigating her damages, and preserving the future value of her investment.  The rare and exceptional nature of this circumstance unidentified, and may constitute a factor relevant to the analysis of downward departure considerations.

### Statistical Information

The Sentencing Commission maintains statistics on a combination of variables impacting the actual sentences imposed within the nation, the circuit, and the district that largely define the comparative configurations of those sentences.  A synopsis of the data is instructive in determining what constitutes a conventional range for the "heartland" of sentences imposed for particular offenses. The Commission's statistics on sentences imposed, relative to the advisory guideline range by primary offense categories, demonstrate that a significant number of fraud offenses resulted in Booker inspired, non-government sponsored, below range sentences.

With respect to offenders receiving various sentencing options nationally, and within the Middle District of Florida, information reflects that a significant number of fraud offenders received sentences that incorporated probation.  Nationally, for the past three statistical years (FY 2014-2016), more than 22 percent of cases were sentenced to a sentence that incorporated a sentence of probation with other alternatives.[26]  Almost 15 percent of those cases received sentences of probation only.  The figures for the Middle District of Florida for the total percentage of cases receiving probation was even higher, at

---

[25] Appendix exhibit Q.

[26] United States Sentencing Commission Statistics: FY 2014-2016. Appendix Exhibit R.

almost 24 percent of all fraud cases sentenced.[27]   The number receiving probation only in the Middle District were only slightly lower than the national figure, at 13.4 percent.   Consequently, there is an established trend for courts both nationally, and within the district, to utilize probation as a viable component of the sentences imposed with respect to offenses related to fraud.

### Factors Militating in Favor of a Variance from the Advisory Guidelines System

The history and characteristics of Ms. Brown, as evidenced by a reiteration of the facts and circumstances in support of a downward departure, reflecting Ms. Brown's unique personal history, the status of her several physical and psychological issues, the impact of the disaster to her residence, and her dedication to the community, militate in favor of a sentence outside of the advisory guidelines system.  The importance of these circumstances are reinforced by Ms. Brown's status as a true first time offender who has been convicted of nonviolent offenses.   Criminological research to date generally indicates that increases in the certainty of punishment, as opposed to the severity of punishment, are more likely to produce deterrent benefits.[28]   Consequently, it is anticipated that a sentence that is at variance with the advisory guidelines system would produce a sentence that is sufficient, but not greater than necessary, to satisfy all of the purposes of 18 U.S.C. 3553(a)(2)(A)(1)-(7).

In addition to other § 3553 factors, there are United States Sentencing Commission policy statements.  The guideline at §2B1.1 has received much historical criticism for being overly punitive in its application to cases perceived as high-loss cases.  This criticism led the Sentencing Commission to entertain amendments to §2B1.1 during the 2015 amendment cycle.   While applauding the Commission's attempt at bringing some measure of balance to sentences in fraud cases, distinguished

---

[27] United States Sentencing Commission Statistics: FY 2014-2016. Appendix Exhibit S.

[28] Wright, Valerie Ph.D., Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment. The Sentencing Project. November 2010.

18

law professor, and ardent student of the history of the fraud guidelines, Frank O. Bowman III, posited

the following view:

> The Commission is surely correct to revisit Section 2B1.1. At least as to high-loss
> defendants, it now does not function as a meaningful tool for sentencing judges.
> While the Commission recognizes this problem, its proposed remedies will not
> solve it.[29]

Despite the fact that the amendment was not agreed upon by the Commission, the court may

find that due to underlying issues accompanying the overall utility of the guideline, the court is at liberty

to absorb the discussion into its § 3553 analysis regarding the need to reconcile the especially onerous

fraud guideline calculations with the individual offender characteristics.[30]

Finally, according to the presentence report, the mandatory restitution provisions are applicable

to this case.  The need to make restitution is an explicitly enumerated factor to be considered in

imposing a sentence under the provisions of § 3553(a)(7).  By statute, restitution is reflected as due to

several individual victims, as well as to the Internal Revenue Service.  To the extent that the victims

expect to be made whole, Ms. Brown, at the age of 71 at sentencing, will need the opportunity to begin

making restitution as soon as possible.  Although her conviction will make certain employment

prospects difficult, Ms. Brown's post-congressional experience and organizational abilities may bode

well for her increased ability to pay restitution in the aftermath of sentencing.

---

[29] www.ussc.gov/Bowman Comment on Proposed Amendments to Economic Crime Guideline, §2B1.1.

[30] Professor Bowman has written extensively on the phenomenon of "Factor Creep," which occurs when the guideline at §2B1.1 acts in a manner to create unrealistically high guideline sentences for so-called high-loss defendants. This occurs, according to Professor Bowman, in two principal ways: (1) By exacerbating the logarithmic character of the 43-level sentencing table not justified by empirical comparisons to the prior fraud guideline (§2F1.1); and (2) The deleterious impact of the ever-increasing overlapping special offense characteristics that are endemic to most perceived high-loss cases. USSC: Comment on Proposed Amendments to Economic Crime Guideline, §2B1.1.

**Ms. Brown's Status as a "True" First-Time Offender**

The Sentencing Reform Act of 1984 requires that the Guidelines reflect the appropriateness of imposing a sentence, other than imprisonment, for the first-time offender who has not been convicted of a crime of violence, or otherwise serious offense.[31]  Recently, the Sentencing Commission completed an eight-year study on the recidivism rates of federal offenders.[32]  Among the findings was the fact that the recidivism rate for offenders in criminal history category I was 33.8 percent.  Additionally, the re-conviction rate for that group was only 19.9 percent.  The Commission also found that when controlling for educational level, offenders who were college graduates had a rearrest rate of just about 19 percent. Ms. Brown is both a true first-time offender (with zero criminal history points), and a college graduate with advanced degrees.

The report also indicated, that of all the major offense categories, fraud offenders were least likely to be rearrested at a rate of 34.2 percent.  By contrast, firearms offenders, were the most likely to be rearrested, at a rate of 68.3 percent.  Not only is Ms. Brown a true first-time offender, her only experience with the court system involved an insufficient check inquiry while she was in graduate school. Consequently, any consideration that the court may have regarding several of the factors listed at 18 U.S.C. § 3553(a)(2), such as the need to protect the public from further crimes, or to afford adequate deterrence, is very likely sated by the aspect of Ms. Brown's status as a true first-time offender.

---

[31]   Alternative Sentencing in the Federal Criminal Justice System, from World Wide Web, http://www.ussc.gov/research_and_statistics/research_projects/alternatives/2009020206_alternatives.pdf,   p.4, Jan. 2009.

[32]   www.ussc.gov/Recidivism Among Federal Offenders: A Comprehensive Overview.

## Alternatives to Imprisonment

As reflected in the presentence report, the statutory provisions do not preclude a sentence of probation.  There are other options that the court can consider in order to fashion a sentence that satisfies the statutory purposes of sentencing.  According to 28 U.S.C. 994(g), there is statutory bias toward considering the impact of prison overcrowding on the application of the sentencing guidelines.[33] Recent trends regarding an evidence-based philosophy toward sentencing, encourage the use of sentencing alternatives, including the use of probation.[34,35]  As of 2015, there were 205,723 prisoners in the Federal Bureau of Prisons, with an overall overcrowding rate of 23 percent.[36]

Should the court conclude that either downward departures, or a variance, or both, from the advisory guidelines system is warranted, a sentence of probation, and other substitutes for imprisonment, may include a sentence of time-served, to be followed by an appropriate period of time on supervised release, to include the use of intermediate sanctions, such as intermittent confinement, community confinement, or home detention, as provided in subsection (c)(3) of §5C1.1.[37]  Such a sentence would correspond to the need to make restitution to the victims.  Furthermore, if required by

---

[33] "[…] the sentencing guidelines prescribed under this chapter shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission."

[34] "The Task Force recommends that the USSC, as it revises its Guidelines for drug offenses, encourage probation for lower level drug trafficking offenses." Final Recommendations of the Charles Colson Task Force on Federal Corrections. From the World Wide Web, Colson-Task-Force-Final-Recommendations-January-2016.

[35] The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. § 3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant. USSG Ch.5, Pt. B, intro. comment.

[36] The Federal Prison Population Buildup: Options for Congress, from World Wide Web, http://www.crs.gov.

[37] One day of home detention for one day of imprisonment. This rule also pertains to the use of jail time as intermittent confinement, as well as community confinement, i.e., the residential reentry center (RRC). USSC §5C1.1(e)(1)-(3).

the court, most United States Probation Offices employ the concept of intensive supervision officers for certain offenders in order to provide an additional level of risk control, thereby making the service of such sentence more punitive.  By incorporating these alternatives into the calculus of the sentencing, the statutory factor of punishment can still be achieved on multiple levels, without the imposition of a sentence of imprisonment.

By successfully serving more than 16 months on unsupervised bond release without incident, Ms. Brown has demonstrated that she is respectful of the law.  Consequently, she is amenable to being supervised by the court, as well as the United States Probation Office.  It is anticipated that Ms. Brown's status as a first-time offender, her unique family responsibilities, and her extraordinary history of public service, and prior history of charitable and good works, would suggest that any of these viable alternatives to imprisonment are warranted in this case.[38,39]

## Retribution vs. Restoration: The Need for Restorative Justice

There are elements converging in this case that challenge the paradigm for the administration of justice.  From antiquity, developed societies largely viewed crimes as offenses against the person, and mainly used the principle of restorative justice to address the needs of correcting harms within the society.[40]  Following the Norman invasion of Britain in 1066 A.D., <u>retributive</u> justice began to replace

---

[38] For example, the court may satisfy the perceived need for imprisonment by imposing a sentence which substitutes weekend jail time, placement in a RRC, or an extended period of time on home detention, as a condition of supervised release, for a straight BOP placement.

[39] An example of a comparable case is U.S. v. Gayle, No. 09-CR-355 (JBW), in which the court imposed a below guidelines sentence of five years on probation. 2010 WL 2540488 (EDNY June 15, 2010) (where the court relied on a variety of factors, including defendant's remarkable history of community service, strong family relationships, defendant a model to many people, and psychological and financial support for defendant's young child.)

[40] Restorative justice seeks to build partnerships to reestablish mutual responsibility for constructive responses to wrongdoing within our communities. Restorative approaches seek a balanced approach to the needs of the victim, wrongdoer, and community, through processes that preserve the safety and dignity of all.   Boyes-Watson, C. (2014). Suffolk University, College of Arts & Sciences, Center for Restorative Justice.

such systems.  Henry I, the son of William the Conqueror, detailed offenses against the "King's peace."

By the end of the 11th century, crime was no longer perceived as injurious to persons, but rather was

seen as an offense against the state.[41]  Most modern states have maintained this societal response to

offenses, and have placed an undue emphasis on the need to "punish" the offender.  Many experts

believe that this philosophical orientation has led to the over-punishment of certain offenders,

accompanied by the superfluous use of imprisonment as a response to a breach in societal norms.

Some have referred to this as the phenomenon of "mass incarceration."[42]  In other words, imprisonment

for the purpose of imprisonment; incarceration to incarcerate; restraining for the sake of restraint.

An example of the restrictive effect on the succession of such policy is the legislative response to

crime by the State of Florida.  In its principal sentencing statute, Florida has declared that "[t]he primary

purpose of sentencing is to punish the offender.  Rehabilitation is a desired goal of the criminal justice

system, but is subordinate to the goal of punishment."[43]  Of course, instead of the guillotine, or the rack,

punishment in modern times almost always means the one-dimensional element of imprisonment.[44]  In

contrast to the Florida statutes, the principle federal sentencing statute calls for an evaluation of the

balance of several factors – presumptively equal -- that should be consulted in determining the need for

the sentence to impose a sentence that is sufficient, but not greater than necessary.[45]  Ironically, both

---

[41] Benson, B. "Crime: Restitution and Retribution." Florida State University.

[42] Michelle Alexander, The New Jim Crow: Mass incarceration in the Age of Colorblindness (2010) New York: New Press.

[43] § 921.002(1)(b), Fla. Stat. (2016).

[44] To its credit, however, the Florida legislature has added that the "**use of incarcerative sanctions is prioritized** toward offenders convicted of serious offenses and certain **offenders who have long prior records, in order to maximize the finite capacities of state and local correctional facilities** [emphasis added]."  § 921.002(1)(i), Fla. Stat.

[45] 18 U.S.C. § 3553(a)(2).  For example, the need for "just punishment" may be contrasted, and balanced, with the

the State of Florida and the United States Courts have recently undertaken initiatives to reduce the reliance on imprisonment through the creation and utilization of alternative-to-incarceration programs.[46]

Under the rubric of federal sentencing, the elements of this case are ripe for the principle of restorative justice.  At its core, the case exposes the juxtaposition between an elected official, charged with facilitating the activities of a defective charity, formed by others, which benefitted from the public persona of Ms. Brown.  By statute, the donors, many of them from local communities, have suffered harm, and are entitled to restitution.  It cannot be disputed that they were motivated to give for altruistic purposes.  As a consequence, certain segments of the community have loss trust in Ms. Brown.

In addition to making restoration to the victims, Ms. Brown has the ability to make restoration to the larger community in a way that will compensate for any wrongs done, and provide a future foundation for the benefit of children and families.  Retribution is not mandatory, nor is imprisonment required by statute.[47]  The massive negative publicity generated by Ms. Brown's conviction can be converted into positive energy by using her notoriety as a public example of a fallen person <u>working</u> in the community to repair harms, and restore broken trust.  Ms. Brown can be required to make public apologies to each of the donors, whose contributions to One Door were misdirected from their efforts to benefit youth.  All of these things, she can do at the very least.  Ms. Brown can also be ordered to participate in the televised production of public service announcements directed at youth to encourage

---

need for "the kinds of sentences available," or any other combination of factors enumerated at § 3553(a)(2)-(7).

[46] www.ussc.gov/Federal Alternative-to-Incarceration Court Programs.

[47] For example, there are federal crimes, such as certain drug offenses, that preclude probation as a sentence. 18 U.S.C. § 841(b).

them to make good life choices.  All of these objectives can be accomplished by a sentence of probation, including a combination of court-ordered special conditions.[48]

The foundation of Ms. Brown's efforts can be built upon Ms. Brown using her extensive knowledge of government and public policy to provide community service to nonprofit organizations that serve children and students – particularly those at risk.[49]  Even at age 71, Ms. Brown still has the energy, popularity, and love of community, to accomplish these objectives.  Although the jury has decided Ms. Brown's guilt, the court can provide the foundation for the restorative justice necessary to balance the needs of the victims and the community, as well as Ms. Brown.

**Stakeholders Attitudes toward Sentencing Mitigation**

A number of stakeholders in the federal criminal justice system are amenable to the consideration of a wider spectrum of factors that courts should consider at sentencing.  In the Sentencing Commission's 2010 survey on the attitudes of United States District Judges, the jurists responded to several questions pertinent to the factors in mitigation in this case.  Question 13 involved "Departures and Variances: Factors to Consider at Sentencing."[50]

First, the Commission found that with respect to the issue of family ties and responsibilities, 62 percent of the judges affirmed that this factor is ordinarily relevant to departure and/or variance consideration.  Only two percent of the jurists opined that this consideration was never relevant to sentencing.  As reflected earlier in this report, Ms. Brown has an 89-year-old mother who suffers from dementia, and the status.  She depends on Ms. Brown, both physically and psychologically, for her

---

[48] USSG §5B1.3(d). "Special" Conditions (Policy Statement); Community service up to 400 hours may be imposed. USSG §5F1.3, comment. (n.1) Community Service.

[49] There are a number of such agencies in Jacksonville, Florida, such as the Beaver Street Enterprise Zone, its umbrella organization, Fresh Ministries, and the Jacksonville Urban League, among others, that provide opportunities for the service of court-ordered community service.

[50] Appendix Exhibit T.

quality of life at her advanced age, and medical condition.  Ms. Brown has always provided necessary and meticulous support for her mother.

Second, with respect to issue of physical condition, the Commission found that 60 percent of the judges opined that this factor is ordinarily relevant to downward departure/variance consideration. Only three percent of the respondents found that this factor is never relevant to a determination at sentencing.  In this case, Ms. Brown has multiple diagnoses that are significant in nature, which have both current and future implications for physical condition.

Third, regarding a defendant's mental and emotional condition, thoroughly 79 percent found this factor to be relevant.  None of the judges felt that this factor is never relevant. Currently, Ms. Brown has diagnostic information submitted under separate cover, identifying both mental and emotional conditions that may be warranted in a determination of departure and variance considerations. Further, in close association with Ms. Brown's physical, mental, and emotional conditions, is the factor of her advanced age.  She will be 71 years old at the time of sentencing.  Sixty-seven percent of the survey respondents stated that age is a salient consideration for departures and variances, while none of the judges rejected this factor.

Fourth, the judges opined that a record of prior good works merits strong consideration for departures and variances.  Those answering in the positive were 62 percent, versus only three percent who disagreed.  Ms. Brown has a prolific history of not only good works, but employment-related contributions, and civic and public service as well.  Regarding public service and employment-related contributions, the jurists responded positively at a rate of 60 percent and 47 percent, respectively.

Consequently, the aforementioned factors present in Ms. Brown's case, in combination, are consistent with the opinions by the judicial survey respondents, in a determination of what circumstances that should be factored into the calculus of the sufficiency of a sentence.

In a joint response to the United States Sentencing Commission's request for comment on a proposed amendment to the sentencing guidelines on "First-Offenders/Alternatives to Incarceration," four prominent national organizations interested in criminal sentencing, and the administration of justice, offered the following summary:

> The undersigned applauds the Sentencing Commission's consideration of an amendment to increase the availability of sentences of alternatives to incarceration within the federal sentencing guidelines. The Sentencing Reform Act of 1984, which created the guideline system, wisely recognized the appropriateness of non-incarceration sentences in certain cases. Since that time criminological research has underscored Congress's assumptions, and evidence suggests, that a broader cohort of people than at present could be sentenced within the federal system more efficiently without incarceration. Doing so would not compromise public safety, but would save tax dollars, preserve families and enhance rehabilitation. [51]

The Equal Justice Institute, a nonprofit research and advocacy group headquartered in Montgomery, Alabama, and led by widely acclaimed public interest lawyer, Bryan Stevenson, who advances policies to monitor and redress the effects of excessive punishment in court systems, has articulated the following position:

> More than 2.2 million Americans are imprisoned, most serving excessively long sentences that advance no public safety purpose, and come at great expense to taxpayers. The politics of fear and anger in the 1980s and 1990s led to so-called "tough on crime" sentencing policies that are now being recognized as harsh, counter-productive, discriminatory, and fiscally irresponsible.[52]

Finally, The Sentencing Project, a research and advocacy reform group in Washington, D.C., challenges the futility and inappropriateness of indiscriminate incarceration to achieve the legitimate goals of societal well-being by positing the following view:

> The United States is the world's leader in incarceration, with 2.2 million people currently in the nation's prisons or jails -- a 500 percent increase over the past

---

[51] Response to the United States Sentencing Commission, by The Sentencing Project, Human Rights Watch, Gamaliel Fire of Faith, and the ACLU, from World Wide Web: http:// www.sentencing project.org.

[52] Equal Justice Institute: Excessive Punishment, World Wide Web: https://www.eji.org/mass-incarceration.

thirty years.  These trends have resulted in prison overcrowding, and state governments being overwhelmed by the burden of funding a rapidly expanding penal system, despite increasing evidence that large-scale incarceration is not the most effective means of achieving public safety.[53]

Accordingly, a wide range of responsible participants agree, that whenever practicable, courts should apply the rule of parsimony, and exercise a bias toward imposing the least onerous sentence possible under the law.

### Conclusion

In consideration of the forgoing discussion and analysis, there is ample evidence in mitigation to allow the Court to fashion a sentence either in departure, or at variance, or both, from the advisory guidelines system.  This position is particularly supported by the factors outlined in support of downward departure and the preponderance of factors militating in favor of a sentence outside of the advisory guideline system. More importantly, Ms. Brown's case represents a lifetime of productive benefits to society against one set of circumstances that represent a marked deviation from an otherwise law-abiding life.  Ms. Brown thanks the Court for its time and consideration in reviewing this report.  Ms. Brown respectfully requests that the Court utilize this information to impose a sentence that is "sufficient, but not greater than necessary," under the circumstances of this case.

---

[53] The Sentencing Project: Incarceration, from World Wide Web: http://www.sentencing project.org.

The forgoing comprehensive sentencing mitigation report has been prepared on behalf of Ms. Brown at the request of defense counsel, and is submitted in support of sentencing on November 16, 2017, before the Honorable Timothy J. Corrigan, United States District Judge in the United States District Court, Jacksonville Division.

Respectfully submitted,

_/s/_ C.R. Dawson
Carlos R. Dawson
Sentencing Mitigation Consultant
The Cord Strategies Group, LLC
5252 Clapboard Creek Drive
Jacksonville, FL 32226
(904) 910-5059
(904) 696-1111 fax
e-mail: crd@cordstrategiesgroup.com