**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                 CASE NO. 3:16-cr-93-J-32JRK

CORRINE BROWN
ELIAS SIMMONS

_____

UNITED STATES OF AMERICA

vs.                                                                 CASE NO. 3:16-cr-34-J-32JRK

CARLA WILEY

_____

**<u>SENTENCING ORDER</u>**[1]

## I.    Introduction

As I have written before, when I am asked what's the most important attribute of a good judge, I say 'humility.'  This is especially true in sentencing.  No matter how long we judges have done it, we can never forget what an awesome responsibility it is to decide whether and for how long to deprive someone of their liberty.  We also must remember our duty to those affected by the sentencing, to the general public, and to the cause of justice, and must do everything we can to get it right.[2]

_____

[1]Read in open court on December 4, 2017, before pronouncement of sentence.

[2]"Who Appointed Me God?  Reflections of a Judge on Criminal Sentencing," Judicature, Vol. 100, No. 3 at 32-33 (Autumn 2016) Duke Law Center for Judicial Studies.

"[S]entencing is the most multifaceted, emotional, and challenging task a judge performs."[3]  To bring home this point, after 46 years on the bench, my colleague and mentor, the Honorable William Terrell Hodges, recently sentenced his last defendant. At the end of the sentencing, Judge Hodges recalled advice he had received years earlier from his mentor, Judge Charles Scott, about sentencing:  "If it ever gets easy, it's time to quit."

Fortunately, the law gives me some tools to help make the difficult sentencing decisions.  The federal sentencing statute, 18 U.S.C. § 3553(a), lists a number of factors for the Court to consider in arriving at a sentence.  These 3553(a) factors include the nature and circumstances of the crime committed, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the crime, promote respect for law and provide just punishment, the need for deterrence, and protection of the public, among others.  The statute also requires consideration of the advisory sentencing guidelines.

While these sentencing factors are helpful, they do not yield a specific result, as if a mathematical equation.  Rather, it ultimately remains the task of the sentencing judge to determine a sentence that, in the words of the statute, is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  It is to this task that we now turn.

―――――――――――――――――

[3]Id. at 25.

**II.      The Nature and Circumstances of the Offense (Applies to all defendants)**

On May 11, 2017, a jury returned a guilty verdict against former United States Congresswoman Corrine Brown on 18 felony counts of conspiracy, aiding and abetting mail and wire fraud, concealing material facts on her Congressional financial disclosure forms, and various tax related charges.  Her co-defendant and former Chief of Staff, Elias "Ronnie" Simmons, had already pled guilty to two counts of conspiracy and aiding and abetting theft of government funds, and their co-conspirator, Carla Wiley, had pled guilty to conspiracy to commit wire fraud.[4]  Although both Ms. Brown and Mr. Simmons also stand convicted of crimes that did not involve their co-conspirators, the centerpiece of the prosecution was the illegal scheme involving all three defendants– their knowing and willful participation in the fraudulent solicitation and theft of funds from the charity known as One Door for Education.

One Door for Education was operated as a criminal enterprise by Carla Wiley, Ronnie Simmons and Corrine Brown.  While each had different roles in this criminal enterprise, they all reaped the benefits of their fraudulent activities.  The defendants' fraud was particularly shameless because it utilized a charity established to honor Ms. Wiley's mother that was supposed to help disadvantaged children.  Yet precious little

---

[4]In a separate one-count information, Carla Wiley was charged with conspiring to commit wire fraud with "Person A" (Corrine Brown) and "Person B" (Elias "Ronnie" Simmons).  Case No. 3:16-cr-34-J-32JRK, Doc. 1 at 2..  In the indictment charging Corrine Brown and Elias "Ronnie" Simmons, Carla Wiley is identified by name as their co-conspirator.  Case No. 3:16-cr-93-J-32JRK, Doc. 1 at 2.

of the hundreds of thousands of dollars donated to One Door was used for this purpose.  Rather, One Door funds were primarily used to line the pockets of Ms. Wiley, Mr. Simmons and Ms. Brown or to fund events that mainly benefitted Ms. Brown, but did not help children.

Ms. Wiley started One Door for Education in Virginia in 2011 with the intent to establish scholarships for students interested in becoming teachers like Ms. Wiley's mother.  But she was unable to raise much money on her own and the charity did very little.  In 2012 she began a relationship with Mr. Simmons who saw an opportunity for then Congresswoman Brown to become involved with One Door.  Although Mr. Simmons was never an authorized signatory on the One Door accounts, Ms. Wiley turned the checkbook and debit card over to him in August 2012.  Almost immediately, Ms. Brown began soliciting donors to contribute to One Door.  And as quickly as the money flowed in, Mr. Simmons withdrew it at Ms. Brown's direction, forging Ms. Wiley's signature when necessary.  Ms. Wiley monitored the One Door bank account and was aware of the money coming into and leaving the account.  At Mr. Simmons' request, Ms. Wiley regularly advised him when donated funds had cleared, enabling him to withdraw more money.  Sometimes Mr. Simmons went directly to an ATM, withdrew the maximum amount allowed, and delivered the cash to Ms. Brown in her House office.  At other times, he withdrew the funds from One Door via an ATM and deposited them into Ms. Brown's bank account at another bank

4

just minutes away. Mr. Simmons also helped himself to the One Door cash. Thousands of dollars in One Door checks were made out to third parties who then wrote checks to Ms. Brown which she or Mr. Simmons deposited into Ms. Brown's personal accounts. Other times One Door paid for goods, services or events benefitting Ms. Brown, Mr. Simmons and Ms. Wiley. Ms. Wiley, who had online access to the One Door bank account, also took One Door funds.

Ms. Brown and Mr. Simmons solicited and received over $833,000 which was deposited into the account of One Door, an entity Ms. Brown falsely touted to donors as being a 501(c)(3) charity providing educational opportunities for children. The government's forensic accountants traced $330,000 of that money to events attended by Ms. Brown or held in her honor, such as sky box seats at an NFL game, a luxury box at a Beyoncé concert, and free catered parties with live music held in upscale hotels, none of which had anything to do with charitable fundraising for One Door; $93,536 in ATM withdrawals which Mr. Simmons either gave to Ms. Brown in cash, deposited for her, or kept for himself; $16,641 funneled through third parties to Ms. Brown's personal bank accounts or those of her daughter; $15,156 to pay for Mr. Simmons' expenses; $13,292 to pay expenses of Ms. Brown and her daughter; $182,730 stolen by Ms. Wiley; and $2,936 for Mr. Simmons and Ms. Wiley to take a Miami Beach vacation.

Compounding the seriousness of these crimes, both Ms. Brown and Mr. Simmons traded on Ms. Brown's status as a member of Congress to solicit the donations to One Door which they then fraudulently converted to their own use. And each committed additional crimes facilitated by their public positions: Ms. Brown used her clout as a Congresswoman to convince charitable organizations to inflate her donations so that she could fraudulently claim deductions on her income tax returns. Mr. Simmons, as Brown's Chief of Staff, created a bogus government job for his sister thereby forcing the taxpayers to pay the sister salary and benefits she had not earned. Mr. Simmons then took a significant part of the sister's compensation for his own personal use.

The public had a right to expect that Ms. Brown, as an elected member of Congress, and Mr. Simmons, her long time Chief of Staff, would not abuse their positions of public trust and responsibility. It also had a right to expect that Ms. Wiley, Mr. Simmons and Ms. Brown would not steal money donated for the benefit of children and spend it on themselves. Nor can any of these three individuals rationalize their criminal conduct by claiming financial hardship– each had jobs which paid substantial salaries. Rather, this was a crime borne of entitlement and greed, committed to support a lifestyle that was beyond their lawful means. In short, this was bad business.

One of the complicating aspects of the sentencing decision in these cases is what to make of the victims.  Unlike many of the fraud victims I have seen over the years in this Court, none of the One Door donors were devastated or financially ruined by the crimes of these defendants.  Many of the donors were wealthy.  While surely some were motivated to donate to an obscure Virginia-based charity for benevolent reasons, others sought to maintain access to Ms. Brown and remain in her good graces.  Although the government was required to notify all of these victims of their right to speak at the sentencing hearing, apparently none felt sufficiently aggrieved to do so.

Nevertheless, even taking into account the mixed motives of some of the One Door donors, all of them had a right to expect that a substantial portion of their donation would be used for the stated purpose:  to help children.  Many of the donors testified that Ms. Brown personally visited them to ask for donations to One Door.  The donors who testified said they would not have given the money had they known it was going to personally benefit Ms. Brown, Ms. Wiley and Mr. Simmons.

There is one additional victim– One Door itself.  These defendants systematically looted One Door funds which otherwise would have been available to help deserving children.  Just think of the good that could have been done with that money if it had been used for its proper purpose.

7

The Court now turns to an individual assessment of each defendant's sentencing factors.

## III.   Carla Wiley

Before her involvement with Ronnie Simmons, Ms. Wiley was, by all accounts, a well regarded person who devoted substantial time to civic affairs.  Ms. Wiley started the One Door for Education charity for the good purpose of honoring her mother, a life long teacher, and to provide scholarships and other assistance to deserving children.  According to One Door's website, the goal of One Door was to "[provide] scholarships and opportunities to students pursuing a degree in Education as well as opening doors in the community."  The One Door slogan was  "We make your education dreams a reality."  In reality, very little of the money donated to One Door benefitted children.  Instead, Ms. Wiley, having entered into a relationship with Mr. Simmons, ceded operational control over the One Door fundraising and spending to Mr. Simmons, knowing that he intended to use One Door as a vehicle to fund Ms. Brown's activities and personal lifestyle.  Even though Mr. Simmons was in charge, Ms. Wiley remained involved in One Door's fraudulent activities.  Despite being the registered agent and director of One Door, Ms. Wiley never complied with any of the state and federal laws governing charities.  And while One Door advertised itself as a 501(c)(3) tax exempt organization, at no time did Ms. Wiley do what was necessary to make that representation true.  Ms. Wiley also monitored the One Door accounts

8

so she could see the money flowing in and out and helped to facilitate the deposit of checks from One Door donors.

If this was all Ms. Wiley had done, it would be bad enough.  But Ms. Wiley decided to take advantage of the large amount of money flowing into One Door to feather her own nest.  Between 2012 and 2016 she initiated approximately 160 individual electronic transfers from the One Door account to her personal bank account and to one she shared with her son, totaling over $120,000.00.  These transfers ranged in size from $50.00 to $9,000.00 and on numerous occasions Ms. Wiley initiated multiple transfers on the same day.  She also withdrew an additional $41,600.00 from the One Door account, made personal car payments totaling more than $16,000.00, used approximately $3,500 of One Door funds to pay her personal credit card bills, and received an airline ticket One Door paid for, valued at nearly $800.  All told, Ms. Wiley personally stole $182,730.26 from her mother's charity.

Ms. Wiley engaged in serious and repeated criminal conduct over a period of nearly four years.  There is no indication that she would have stopped had law enforcement not intervened.  It is true that once law enforcement did confront her, Ms. Wiley was immediately cooperative.  As the government has argued in seeking a substantial reduction in Ms. Wiley's sentence, Ms. Wiley's decision to cooperate against Mr. Simmons and Ms. Brown was no doubt difficult.  For the past twenty-one months, Ms. Wiley has been under the dark cloud of a federal felony conviction.  She

testified before a federal grand jury and also testified at Ms. Brown's trial, neither an easy task.  The government rates Ms. Wiley's cooperation as vitally important to putting the meat on the bones of the cases against Mr. Simmons and Ms. Brown.  The Court often notices that with cooperation also comes acceptance of responsibility and remorse.  This appears to be the case with Ms. Wiley.

While the Court has considered whether Ms. Wiley's criminal conduct can be considered aberrational, the four year span of her crimes and the large amount of money she stole make such a finding difficult.  Nevertheless, given Ms. Wiley's stellar cooperation with the government, her acceptance of responsibility and statement of remorse, the Court believes that once her debt here has been paid, Ms. Wiley will resume a productive and law abiding life.  Ms. Wiley is very unlikely ever to commit another crime; thus specific deterrence and the need to protect the public from further crimes of Ms. Wiley are not issues.

The Court is also required to seek to avoid unwarranted sentencing disparities among similarly situated defendants.  Although not entitled to a minor role reduction,[5]

_____

[5]As announced at Ms. Wiley's November 15, 2017 sentencing hearing, the Court overrules her minor role reduction objection, finding that Ms. Wiley's role was not "substantially less culpable" than that of the other participants, Mr. Simmons and Ms. Brown. For example, Ms. Wiley participated in the scheme by updating One Door's website to reflect Ms. Brown's affiliation, helping plan purported fundraising events, mailing letters  and providing gift receipts to donors, informing donors their funds would be used for charitable purposes, and depositing hundreds of thousands of dollars in donated funds.  Ms. Wiley also had complete control over the funds and could have stopped the scheme at any time. She does not qualify for a minor role adjustment within the meaning of U.S.S.G. §3B1.2.

the Court agrees with the government that of the three defendants before the Court, Ms. Wiley is the least culpable.  Because Ms. Wiley is not a public official, I have also considered how her conduct fits in with other fraud cases involving private citizens. While it is true that a sentence of probation and restitution is possible for some first time fraud offenders, the Court here judges Ms. Wiley's actions to be aggravated.  Ms. Wiley helped convert a charity created to honor her mother into a criminal enterprise designed to facilitate the criminal purposes of Mr. Simmons and Ms. Brown and then personally enriched herself to the tune of $182,730.26.  A sentence of probation would not be sufficient to account for such audacious and long term misconduct.

Ms. Wiley's able counsel contended that incarcerating Ms. Wiley is unnecessary because she can benefit society and be in a better position to pay restitution with a non-incarcerative sentence.  While the Court agrees that not every crime requires incarceration, Ms. Wiley's conduct here is too serious to avoid the ultimate form of punishment in a fraud case– a term of incarceration.  The Court has also considered the remaining 3553(a) sentencing factors, including the advisory sentencing guidelines which, with the substantial assistance credit, recommend a sentence of 21 to 27 months.

## IV.    Elias "Ronnie" Simmons

Mr. Simmons engaged in serious criminal conduct.  As the long time Chief of Staff to Ms. Brown, Mr. Simmons was duty-bound to act lawfully.   Shirking this

responsibility, Mr. Simmons instead co-opted a children's charity to illegally benefit Ms. Brown and himself.  After receiving access to One Door from Ms. Wiley, Mr. Simmons, in concert with Ms. Brown, began systematically misusing One Door as a fundraising mechanism for illicit purposes.  Instead of utilizing Ms. Brown's fundraising prowess to benefit deserving children, Mr. Simmons used One Door donations to facilitate Ms. Brown's personal agenda and to provide illegal funds for both his own and Ms. Brown's personal use.

Beginning in August 2012, Mr. Simmons issued letters, bearing Ms. Brown's electronic signature, soliciting donations for One Door and stating that One Door was holding a reception to honor Ms. Brown for her "efforts in the arena of protecting and promoting the advancement, health and wellbeing of minority youth."  Doc. 156, Ex. 34 (Doc. 156-266).  The letters sought contributions and falsely stated that One Door was a 501(c)(3) tax exempt organization.  At that same time, Mr. Simmons assumed operational control over the money in One Door's account.  He made no attempt to comply with any of the state and federal laws governing the operation of charities.  He repeatedly made fraudulent representations about how One Door donations would be used and facilitated Ms. Brown's efforts to obtain other donations.   In addition to holding events honoring Ms. Brown that resulted in no scholarships or educational opportunities, Mr. Simmons also made over $93,000.00 in ATM withdrawals from the One Door account (money that was primarily given to Ms. Brown, though Mr.

Simmons kept some of it), and he used the funds for other expenditures for himself, Ms. Brown and Ms. Wiley.

Mr. Simmons' counsel seeks to minimize his client's culpability in two primary ways.  First, counsel contends that Mr. Simmons was essentially co-opted by Ms. Brown who demanded complete loyalty and obedience.  The Court rejects this argument.  While certainly any chief of staff to a member of congress owes the member their best efforts, that does not include committing criminal fraud.  Mr. Simmons actively embraced his role in the fraud, which advanced his own agenda and from which he personally benefitted.  Second, Mr. Simmons' counsel portrays Mr. Simmons' One Door fraud as aberrational conduct.  The Court is unpersuaded.  Mr. Simmons' criminal activity concerning One Door spanned a four year period and only ceased when Ms. Wiley was arrested.  Mr. Simmons has also admitted to an entirely different fraud, one having little to do with Ms. Brown.  According to his plea agreement, beginning in 2001 and continuing until March 2016, Mr. Simmons misappropriated taxpayer funds by placing his sister on the congressional payroll when, as Mr. Simmons has admitted, "[a]t no time did [his sister] perform legitimate work for Brown's congressional office or the House of Representatives."  Doc. 96 at 46.  Mr. Simmons compounded this crime by converting a significant amount of his sister's illegal compensation to his own personal use.  Thus, counting both the One Door fraud and the theft of government funds concerning his sister's illegal

13

employment, Mr. Simmons defrauded both the government and private individuals for 15 years.

I do credit Mr. Simmons' acceptance of responsibility and think it unlikely he will commit future crimes.  I also understand that Mr. Simmons' decision to cooperate, though taken only after he and Ms. Brown initially asserted a joint defense, was difficult given his longstanding relationship with Ms. Brown.  And there is no doubt that Mr. Simmons' trial testimony against Ms. Brown was important to the government's case.   The Court has previously granted the government's motion based on substantial assistance and has set the advisory guidelines range at 33 to 41 months.

However, Mr. Simmons, a high ranking congressional staff member, has committed serious and long term fraudulent conduct.  Given Mr. Simmons' heavy involvement in One Door activities and his separate fraud involving his sister, but for his decision to cooperate and accept responsibility by pleading guilty, the Court views him as on par with Ms. Brown.   In sentencing Mr. Simmons, the Court will vary upward from the advisory guidelines range.

14

## V.    Corrine Brown

The Court first addresses the specific guidelines objections lodged by Ms. Brown.

### A.    Amount of Loss- U.S.S.G. § 2B1.1(b)(1)

The probation officer, supported by the government, lists the fraud loss figure attributable to Ms. Brown at $664,292.65.[6]  Ms. Brown principally argues that the $330,000 of One Door funds spent on events either featuring or honoring her should not be considered because "[a]ll of the events that Congresswoman Brown solicited funds for took place" and that "[w]hile most of the events did not raise any funds, that is not evidence of fraudulent or criminal intent.  The planners and organizers of the events simply failed to employ best practices in order to raise enough funds." Defendant Brown's Objections to the PSR (Doc. 219) at 56.  However, the Court finds that the government has shown by a preponderance of the evidence that neither Ms. Brown nor Mr. Simmons, despite statements at trial to the contrary, ever intended that these events would attract additional donations to One Door which would be used for charitable purposes.  Nonetheless, in reaching an ultimate sentence for each of these three defendants, the Court will take into account that these events did occur and that it was not the same type of loss as the direct payments made to Ms. Brown, Ms. Wiley

_____

[6]An additional tax loss to the IRS of $62,650.99 is attributed to Ms. Brown.  Because of the way offenses are grouped under the sentencing guidelines, this sum is not included in the amount of loss on the fraud charges.

and Mr. Simmons from One Door's money.

The Court also rejects Ms. Brown's objection to the amount of loss related to funds converted by Ms. Wiley and Mr. Simmons about which Ms. Brown claims not to have had personal knowledge.   Participants in a conspiracy may be held "responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy."  United States v. Mateos, 623 F.3d 1350, 1370 (11th Cir. 2010) (citing United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003)).  Ms. Brown was personally responsible for all or nearly all of the $833,000 that flowed into One Door because, without her clout, donors would not have given to One Door.  Even if she did not know how all the money was being used, there was never any intent that the bulk of the money would be used for charitable purposes. It was therefore reasonably foreseeable that the One Door money would be used by her and her co-conspirators for illicit purposes, which is exactly what happened.  The Court finds Ms. Brown and each of her co-conspirators (neither of whom is objecting) are responsible for loss in an amount greater than $550,000.  Ms. Brown's objection to the amount of loss is overruled.

### B.    Abuse of Position of Trust- U.S.S.G. § 3B1.3

As a member of Congress, Ms. Brown held one of the highest positions of public trust in American government.  Under the sentencing guidelines, if Ms. Brown abused her position as a member of Congress in a manner that significantly facilitated

the commission or concealment of the offense, the enhancement applies.  "[F]or the abuse-of-trust adjustment to apply in the fraud context, there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario."  United States v. Williams, 527 F.3d 1235, 1250-51 (11th Cir. 2008).  The evidence showed that One Door donors placed such special trust in Ms. Brown.  Ms. Brown traded on her status as a member of Congress to solicit donations to One Door.  The abuse of trust adjustment applies.

### C.    Obstruction of Justice- U.S.S.G. § 3C1.1

The government points to Ms. Brown's trial testimony in arguing that a two level obstruction of justice enhancement should apply.   "A defendant is subject to enhancement of [her] sentence if [she] 'willfully obstructs or impedes, or attempts to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.'"  United States v. Williams, 627 F.3d 839, 845 (11th Cir. 2010) (citing U.S.S.G. § 3C1.1).  "The enhancement is applicable if a defendant commits perjury." Id. (citing U.S.S.G. § 3C1.1, cmt. n. 4(B)).  To find obstruction, the Court must make "an independent factual finding that the defendant willfully lied in trial testimony."  United States v. Husky, 924 F.2d 223, 224 (11th Cir. 1991).  Not every defendant who testifies and is then convicted has necessarily committed perjury.  And the threat of an obstruction

17

enhancement should not be used to burden a defendant's constitutional right to testify on her own behalf.  See United States v. Lawrence, 972 F.2d 1580, 1581-83 (11th Cir. 1992).  Thus, the Court must be cautious in applying this enhancement based solely on a defendant's trial testimony.

Pointing to her general denials of criminal conduct and several specific instances where her testimony diverged from that of other witnesses and evidence, the government claims Ms. Brown committed perjury.  The Court declines to base an obstruction enhancement on Ms. Brown's general denials of criminal conduct.  As to the specific instances cited by the government, the Court finds the strongest evidence of untruthful testimony arose when Ms. Brown testified about the tax charges, testimony the Court found largely incredible.  But, because of the way offenses are grouped under the sentencing guidelines, the tax charges, even if enhanced for obstruction of justice, do not change the final guidelines calculation.  As to the fraud charges, the Court found some of Ms. Brown's testimony to be hedging, non-committal, off-topic and evasive, but declines to make a specific finding that she committed perjury.  The Court therefore sustains Ms. Brown's objection and will not apply the two level enhancement for obstruction of justice.

### D.     Guidelines Calculation

Except for the Court's decision not to apply the two level enhancement for obstruction of justice to the fraud charges, the Court determines that the offense level

18

computation in the Presentence Investigation Report at ¶¶ 94 through 119 is correct. All of Ms. Brown's other objections are overruled.  This means that the Court will utilize the advisory guidelines recommending 70-87 months imprisonment.[7]

### E.    The Other 3553(a) Factors

The jury found beyond a reasonable doubt that Ms. Brown had defrauded and deceived One Door for Education donors and illegally used One Door funds for her own personal purposes.  Ms. Brown also stands convicted of tax fraud and lying on her financial disclosure forms.  These are serious crimes, made all the more so because Ms. Brown used her position as a member of Congress to facilitate her criminal activity.

While the Court has previously summarized Ms. Brown's criminal conduct, the Court offers one additional illustration:  Having routinely converted One Door money for her own personal use, Ms. Brown turned around and falsely stated on her tax returns that she had actually donated money to One Door for which she claimed a substantial charitable deduction.  Brazen barely describes it.

Both at trial and in her sentencing statement to the Court, Ms. Brown admits only to running a disorganized office and of trusting the wrong people.  This view is

---

[7]If the Court had lowered the amount of loss under U.S.S.G. § 2B1.1(b)(1) so it fell within the range of greater than $250,000 but not more than $550,000, this would lower the advisory guidelines by two levels, resulting in a guideline range of 57-71 months.  Because of a downward variance, the Court's final sentence is within those lower advisory guidelines.

echoed by many of Ms. Brown's supporters, both those who wrote me and those who appeared at her sentencing hearing, who simply cannot accept that the person they regarded as their champion did anything wrong.  However, the jury heard this same explanation and rejected it, instead finding Ms. Brown guilty of intentional fraudulent conduct, of knowingly and willfully misrepresenting material information on her financial disclosure forms, of corruptly impeding the due administration of the tax laws, and of knowingly and willfully preparing and filing false tax returns.   In sentencing Ms. Brown, it is the Court's responsibility to give voice to the jury's verdict.

In considering the history and characteristics of Ms. Brown, there is no doubt she has achieved much and served her community well over the years.  As an African-American woman coming of age in Jacksonville in the 60's and 70's, Ms. Brown had to persevere and suffer indignities to achieve her goals.  In the process, she became an advocate for many who previously had not had a political voice.  The Court received many letters of support for Ms. Brown sent by both high ranking officials and individual citizens.  Many of these letters talked about Ms. Brown's considerable legislative achievements.  But the ones I found most persuasive were from individuals whom Ms. Brown had assisted in some way.  Whether it be helping a veteran get treatment, or assisting a young person attain a college education, many persons have been touched by Ms. Brown's efforts over the years.  These letters, along with the effective presentation by her character witnesses, show that Ms. Brown

used her high office to compile an admirable record of achievement and service.

But it was also this very same position as a member of Congress that allowed Ms. Brown to commit these crimes.  Ms. Brown leveraged the authority of her office and the relationships she had cultivated to illegal purpose.  In the process she cast aside the very laws that she helped to enact.  The rules, she decided, did not apply to her.

While Ms. Brown is of course free to maintain her innocence, because she stands before the Court at sentencing unrepentant, she cannot be accorded the same sentencing consideration as someone who accepts responsibility for her wrongful action, expresses remorse, and promises to make amends.

The government portrays Ms. Brown as not only unrepentant but also defiant and contemptuous of the legal system.  The government relies on statements Ms. Brown has made to the media and others outside this courtroom.  The Court agrees that some of Ms. Brown's comments– especially her reprehensible statement implying that the FBI might have been able to prevent the Pulse nightclub shooting in Orlando if it wasn't preoccupied with investigating her– were beyond the pale.  However, the Court chooses not to factor them into the determination of her sentence.  Instead, the Court's focus remains on the other 3553(a) sentencing factors, the crimes Ms. Brown committed, and her accountability for them.

The Court's sentence must also reflect the seriousness of the offense, promote respect for law, and provide just punishment.  In the case of a public official who violates the public trust, there must be accountability.  Likewise, with the public watching, a message of general deterrence is appropriate.  Because Ms. Brown is no longer a member of Congress and is at a relatively advanced age, she is unlikely to commit further crimes; thus specific deterrence and the need to protect the public do not come into play.

The Court must also avoid unwarranted sentencing disparities among similarly situated defendants.  The Court has considered the sentences in other public corruption cases cited by both the government and Ms. Brown, the sentencing statistics of similar crimes compiled by the Administrative Office of the U.S. Courts, the probation officer's recommendation, and the advisory guidelines range. Recognizing that each case is unique, the Court's sentence will be within the mainstream of similar cases.

Citing Ms. Brown's history of public service, her strong family ties, her lack of criminal history, and the pubic humiliation Ms. Brown has already experienced, Mr. Smith urges the Court to impose a "creative and compassionate sentence" of probation with substantial community service.  I have seriously considered this request, but a sentence of probation for a member of Congress convicted of 18 counts involving mail, wire, and tax fraud would not be sufficient.  While I do not relish

the prospect of incarcerating Ms. Brown at her relatively advanced age, she has given the Court no other option because she chose to commit these serious crimes at a relatively advanced age.  I will advise the Bureau of Prisons of Ms. Brown's medical needs.

Finally, while the issue of race is not ordinarily relevant to the Court's sentencing decision, the Court addresses it here because Ms. Brown has raised it. First, Ms. Brown, through her counsel, and character witnesses have told me of the adversity that Ms. Brown, and others of her generation, had to overcome to assume positions of leadership in our community and nation.  There is no doubt that this journey was arduous.  Two of my judicial colleagues in this very building were part of that same struggle for civil rights in the Jacksonville community in the 50's, 60's and 70's.  Ms. Brown is no doubt a trailblazer who also has lifted up others.  I was moved by the statement of her able lawyer, Mr. Smith, that he himself had benefitted from the work of civil rights pioneers like Corrine Brown.  Others have told me the same both here in person and by letter.  But, having overcome all hurdles and risen to high office, Ms. Brown unfortunately succumbed to greed and an entitlement mentality.

It was also suggested by at least one of Ms. Brown's character witnesses, and by Ms. Brown herself in some of her out-of-court statements, that Ms. Brown's race played a role in the prosecution of this case.  The Court does not deny, as Mr. Smith argued, that distrust of law enforcement and the court system by some African-

Americans is rooted in history.  Unfortunately, some of that distrust persists even to this day.  We all need to continue to work to earn the trust of all in our community.  But today this Court only has before it this case.  And, after 21 years on the bench, I say with assurance that, faced with the same evidence of fraud and tax crimes that exists here, the FBI, the IRS, and the United States Attorney would have investigated and prosecuted regardless of the individual's race.

The Court will now proceed to pronouncement of sentences.[8]

\* \* \* \* \* \* \*

**DONE AND ORDERED** at Jacksonville, Florida this 4th day of December, 2017.

TIMOTHY J. CORRIGAN
United States District Judge

---

[8]In Ms. Wiley's case, the Court imposed a 21 month sentence in the Bureau of Prisons, 3 years of supervised release, forfeiture and restitution.  In Mr. Simmons' case, the Court imposed a 48 month sentence in the Bureau of Prisons, 3 years of supervised release, forfeiture and restitution.  In Ms. Brown's case, the Court imposed a 60 month sentence in the Bureau of Prisons, 3 years of supervised release, forfeiture and restitution.

s.
copies:

A. Tysen Duva, Esq. (Asst. U.S. Attorney)
Michael Coolican, Esq. (Asst. U.S. Attorney)
Eric G. Olshan, Esq. (Asst. U.S. Attorney)
James W. Smith, III, Esq.
Samuel A. Walker, Esq.
Anthony Suarez, Esq.
D. Gray Thomas, Esq.
Justin E. Fairfax, Esq.
United States Marshals Service
United States Probation Office
United States Pretrial Services
Defendants